IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

                                    CR Action
        Plaintiff,           No. 1:21-268

   vs.                      Washington, DC
                                    April 5, 2021
JEFFREY MCKELLOP,

                                    MOTIONS HEARING
        Defendant.
_____/

TRANSCRIPT OF REVIEW OF DETENTION ORDER
BEFORE THE HONORABLE CARL J. NICHOLS
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:      MARY LYLE DOHRMANN
                          U.S. ATTY'S OFC FOR D.C.
                          555 4th St, NW
                          Washington, DC 20530
                          (202) 252-7035

For the Defendant:      SETH QUINT PERITZ
                          CROWLEY PERITZ LAW
                          10560 Main Street, Suite 501
                          Fairfax, VA 22030
                          (703)447-8776

Reported By:           LORRAINE T. HERMAN, RPR, CRC
                          Official Court Reporter
                          U.S. District & Bankruptcy Courts
                          333 Constitution Avenue, NW
                          Room 6720
                          Washington, DC 20001

1          **P R O C E E D I N G S**

2          COURTROOM DEPUTY:  This is criminal case year

3     2021-268 United States of America versus Jeffrey McKellop,

4     who is present by video.  Pre-trial officer is Marsha

5     Holman.  Counsel, please introduce yourselves for the record

6     beginning with the Government.

7          MS. DOHRMANN:  Good afternoon, Your Honor.  Mary

8     Lyle Dohrmann on behalf of the United States.

9          THE COURT:  Ms. Dohrmann.

10         MR. PERTIZ:  Good afternoon, Your Honor.  Seth

11    Pertiz on behalf of Mr. McKellop.

12         THE COURT:  Mr. Pertiz.  I note that Mr. McKellop

13    is also on by video.  Obviously, we are here to consider

14    Defendant McKellop's review of detention order.  Before

15    that, I believe we need to arraign Mr. McKellop; is that

16    correct, Ms. Dohrmann?

17         MS. DOHRMANN:  Yes, Your Honor.  Thank you.

18         THE COURT:  I think we can do that by video under

19    the criminal rules without having to make any findings

20    before doing so.  So, Ms. Lesley, can you please arraign the

21    Defendant?

22         COURTROOM DEPUTY:  Yes, Your Honor.

23         Give me one moment.  I apologize.

24         May the record reflect that Defendant and counsel

25    have received the 12-count indictments and waive the reading

1       of the indictment, and do you all wish to enter a plea?

2                    THE DEFENDANT:  [INAUDIBLE]

3                    THE COURT:  I cannot hear you.

4                    MR. PERTIZ:  At this time we would not like to

5       enter a plea.  We would like to defer that.

6                    THE COURT:  Does the Government have a view of

7       that?

8                    MS. DOHRMANN:  No, Your Honor.

9                    THE COURT:  Okay.

10                   Let's proceed on the detention questions and see

11      where we are afterwards.

12                   Before turning to the motion and before making the

13      CARES Act findings I want to briefly remind the Government

14      of the due process protections act.  Pursuant to that act, I

15      order all government counsel to review their disclosure

16      obligations under Brady versus Maryland and its progeny, as

17      set forth in Local Criminal Rule 5.1, and comply with those

18      provisions.  Failure to comply could result in dismissal of

19      the indictment or information, dismissal of individual

20      charges, exclusion of government evidence or witnesses,

21      continuances, Bar discipline or any other remedy that is

22      just under the circumstances.

23                   As to the motion that we are here for, before we

24      proceed, I need to acknowledge the unique nature of today's

25      hearing in light of the COVID-19 pandemic.  Ordinarily we

1       would conduct the hearing in person but during the pandemic

2       Congress has authorized to conduct such hearings by video or

3       telephone as long as the Defendant consents and the judge --

4       -- serious harm to the interests of justice.

5                   Mr. McKellop, after consulting with counsel, have

6       you decided that further delay is inappropriate and that you

7       would like to resolve the dispute over your detention order

8       as promptly as possible and without the risks that attend

9       being physically present in the courtroom during the

10      COVID-19 pandemic?

11                  THE DEFENDANT:  [NO RESPONSE]

12                  THE COURT:  Mr. McKellop, that was a question for

13      you.  Do you agree that further delay would be inappropriate

14      and that you would like to resolve this detention question

15      today as promptly as possible and without the risks that

16      attend being physically present in the courtroom such that

17      we can proceed today by videoconference?

18                  THE DEFENDANT:  Sir, the longer I stay here the

19      worse it gets for me.  There is no one -- I have nobody to

20      rely on besides my attorney.  As far as being detained here,

21      the only thing to be honest with you, so help me God, to

22      tell the truth --

23                  MR. PERTIZ:  I am going to ask that you just

24      answer the question that the judge asked you and not say

25      anything else about the situation; that's my advice to you.

1          THE DEFENDANT:  What am I saying?  Yes or no?

2          MR. PERTIZ:  If you want to proceed with the

3    detention hearing today, yes, then you agree with what the

4    judge has stated.

5          THE DEFENDANT:  Okay.  Yes.

6          THE COURT:  Mr. Pertiz, do you think the interest

7    of justice would be harmed by further delay and agree that

8    we should proceed with this hearing today by video so I can

9    consider the detention question today?

10          MR. PERTIZ:  Yes, Your Honor.

11          THE COURT:  And I assume the Government agrees?

12          MS. DOHRMANN:  Yes, it does, Your Honor; that is

13    correct.

14          THE COURT:  I find that because Mr. McKellop

15    consents to proceed by videoconference and for the reasons

16    stated that it would be in the interest of justice to

17    proceed today and the interest of justice would be harmed by

18    further delay.  I find it appropriate to proceed today by

19    videoconference.

20          We are here on Defendant McKellop's request for me

21    to review the magistrate judge's detention order.  I have

22    reviewed, Mr. Pertiz, your filings, the Government's

23    filings, both in front of me and in front of the magistrate

24    judge, which the Government incorporated by reference.  I

25    have reviewed all of the evidence in the record, including

1     what I understand to be the four videos that the Government

2     is relying on.  I have a pretty good idea of the parties'

3     arguments and the evidence that they rely on, but I would

4     ask, Mr. Pertiz, for you to start.  And feel free to make

5     any and all arguments you think appropriate or in aid of

6     your argument that I should conclude that Mr. McKellop can

7     be released with sufficient conditions to ensure the safety

8     of the community.

9               MR. PERTIZ:  Yes, Your Honor.

10              Since you did read the memorandum in support of

11    pre-trial release that I filed, I won't belabor those

12    points.  I think I laid them out pretty sufficiently in

13    there.

14              As Mr. McKellop stated, he has been in custody the

15    entire time of this incident since, I believe it was March

16    17th is when we surrendered him.  He is being held -- being

17    detained 23 hours a day, has no access to the law library or

18    really any access to anything other than occasionally an

19    iPad for a matter of minutes to send brief messages to

20    anyone who could aid in his defense, including myself.  We

21    had issues with communication.  I know the jail personnel is

22    doing the best it can with a number of individuals there to

23    do legal calls, but even getting him to be able to call me

24    has become difficult.

25              Mr. McKellop is certainly facing some significant

1  charges.  He understands that.  We understand that.  There

2  are some significant lengthy periods of incarceration that

3  are likely to occur if he is found guilty of these charges.

4  In the meantime, Mr. McKellop has not one but two mortgages

5  that he is responsible for that he would like to be able to

6  set straight.  He has resources he would like to be able to

7  tap into to make sure that those houses are taken care of,

8  the individuals he is responsible for are prepared and are

9  able to continue their lives while he is incarcerated, if he

10  is, in fact, incarcerated; that includes his two children

11  and wife he assists in supporting.

12          Aside from that, Your Honor, going back to the

13  main points of detention, the two issues at hand:  Is he a

14  flight risk and is he a danger to the community?

15          As far as flight risk is concerned, the entire

16  month-plus timeframe he has not, in fact, been a risk of

17  flight.  He had multiple opportunities.  He had,

18  essentially, unmonitored periods of time where the

19  Government informed us they were interested in Mr. McKellop

20  that he did not flee.  Then we were told that he was going

21  to be arrested in a matter of days and, again, he did not

22  flee.  Instead he prepared to turn himself in.  Brought a

23  cellphone in to surrender to the government so that they

24  could perform a search warrant on it as they wanted.

25          I think that the flight risk question, even though

1     the standard there is lower, as it's a preponderance of the

2     evidence instead of clear and convincing evidence, I think

3     it is clear and Judge Faruqui agreed that Mr. McKellop is

4     not a risk of flight.

5              So the question then becomes, is he a danger to

6     the community?  The Government presents four videos, an

7     incident that occurred from the last time we were at this

8     hearing between 2:26:48 p.m. and 2:28:19 p.m., which is a

9     total of 2 minutes and 31 seconds -- I'm sorry, 1 minute and

10    31 seconds.

11             Mr. McKellop has spent his entire life, his entire

12    adult life essentially defending this country, the people

13    that work for this country, and people who represent this

14    country abroad.  I certainly understand that these are, you

15    know, these circumstances that surround these events are

16    serious and dangerous and that there were a number of things

17    that occurred that day that I'm sure -- that a lot of people

18    regret what occurred.

19             We are talking about --

20             THE COURT:  I understand, Mr. Pertiz, you rely on

21    Mr. McKellop's service as a characteristic that weighs in

22    his favor against pre-trial detention.  But what seems quite

23    anomalous to me, at a minimum, is someone with that

24    background would nevertheless attack law enforcement

25    officers and, frankly, that is very concerning.  What is

1    your response to at least to the Government's argument that

2    if anything, someone with his background should know better

3    and not attack law enforcement officers; and that his

4    willingness to do so should weigh heavily against allowing

5    him to be released pre-trial?

6            MR. PERTIZ:  Your Honor, I certainly understand

7    the Government's concerns there.  I do think that this was a

8    unique circumstance in the world, in the country.  We had a

9    large group of people who at that time clearly believed that

10   what was going on inside Congress was an unlawful act.  They

11   were led to believe that the country had been lied to.  The

12   response, while certainly not an acceptable response, is

13   certainly one that can be argued as an emotional response

14   that isn't likely to occur again.

15           I think the Government has shown the one

16   circumstance where someone like Mr. McKellop would assault

17   law enforcement in this specific instance when essentially

18   what they believed that people were being lied to, the

19   entire nation was being lied to about who was going to be

20   President of the United States and what happened with the

21   election.  Whether right or wrong, it was a truly-held

22   belief to the thousands of people present that day.

23           I certainly understand that his training and

24   experience might lead some to believe that it would make it

25   so that he is less likely to attack or be willing to attack

1    law enforcement, but they are trained to protect and to

2    defend the ideals of this nation from domestic and foreign

3    invaders.  And, arguably, if they were correct -- and

4    certainly I think the evidence at this point has shown that

5    they were not, but if they were correct, this is a domestic

6    threat.  I think that that's something we should consider

7    when looking at a situation like this.  I think his

8    experience and his defense of this nation has ordered and

9    when, in fact, multiple combat zones should be in his favor

10   and not be looked at as a reason why he should not have

11   committed these crimes.

12          THE COURT:  Obviously, what happened on January

13   6th is very unique so there will not be analogous cases in

14   the past.  Are you aware of any cases in which judges in

15   this court have allowed a defendant to be released pre-trial

16   when that defendant is charged with attacking law

17   enforcement officers?

18          MR. PERTIZ:  Your Honor, I am not.  I know that I

19   have reviewed a number of the detention orders from this

20   court.  I don't remember which charges they were facing.  I

21   know a number of individuals on review were released based

22   on certain circumstances, based on background, health,

23   mental health in general.  I don't believe I can recall any

24   of the opinions I received related specifically to

25   assaulting law enforcement.

1          THE COURT:  Thank you.  Okay.  Please continue.

2          MR. PERTIZ:  Your Honor, as to the character,

3    which I think is really what we come down to on this issue

4    when it comes to what we have just been discussing.  I

5    think, again, the fact that Mr. McKellop was willing and

6    able to turn himself in on a matter of days' notice from a

7    different part of the state coming to -- actually, it was a

8    completely different jurisdiction.  He had to come up into

9    D.C. to turn himself in.

10          I think that given his -- again, with his training

11   and circumstances that the Government points to, I think

12   that shows his willingness to participate, his willingness

13   to be involved in these hearings and willingness to comply

14   with the terms and conditions that this court may place on

15   him.  The Government certainly gave him the opportunity,

16   again, to flee; that certainly shows his character that he

17   did not.

18          As far as the other factors are concerned, I think

19   that I've laid those out pretty significantly in my

20   memorandum.  I think when we look at the final factor of

21   danger to the community, these events were unique in

22   history.  The circumstance was unique in history.  The last

23   time -- this was the first and last time that this has

24   happened in our nation.  I don't believe that Mr. McKellop

25   -- I don't believe there is any evidence to show that Mr.

1    McKellop would be a danger to the community or other people

2    in any circumstance other than this single happening.  He

3    didn't have a criminal record.  He's never had a violent

4    charge before.

5          There's little indication, if any, that he was

6    intending to do what occurred on that day and, again, we are

7    talking about events that occurred in the course of a minute

8    and a half of a man who is in his fifties.  I think that the

9    sheer amount of time where he has never -- has not assaulted

10   anyone, been a danger to the community or charged with an

11   offense should weigh in his favor in this circumstance.

12         I do believe that Mr. McKellop is not a danger to

13   the community; that he would not harm or have any issues if

14   released.  There are certainly conditions this court can

15   place on him, whether it's house arrest or any other list of

16   conditions, that would ensure that Mr. McKellop would not be

17   a danger to the community, if there were any concerns that

18   the court did have.

19         THE COURT:  Do you have any specific proposals as

20   to conditions?

21         MR. PERTIZ:  Your Honor, I think house arrest with

22   GPS monitoring is my recommendation, as far as that is

23   concerned.  We had a third party custodian lined up, however

24   they have, given the events of recent days, decided not to

25   be willing to participate in that.  So as far as that is

1    concerned, essentially as strict as this court wishes to

2    have.

3          I would note that Mr. McKellop does, I think, need

4    to seek VA counseling related to his service; that's

5    something he is not able to obtain within the jail.  He has

6    indicated that to me on a number of occasions.  I know he

7    lauded his case manager for doing her best.  She has 15

8    individuals who are there in similar circumstances and is

9    not able to provide as much help as necessary for any of the

10   individuals involved simply due to the workload.

11          THE COURT:  Thank you, Mr. Pertiz.

12          How would you respond, Ms. Dohrmann?  I am happy

13   to hear from either or both of you.

14          MS. DOHRMANN:  Yes, Your Honor.  I will handle

15   both of it, although AUSA Honold is able to as well.

16          First, I want to address briefly whether the

17   Defendant is a flight risk.  As I hope was clear in our

18   opposition to the incident motion, certainly when the

19   Government conducted a search warrant of his vehicle, there

20   was what appeared to be what you might call a go-pack, a

21   backpack that had meal bars, water, purification tablets and

22   things of that nature that suggest a preparedness ability to

23   flee.  The Government would submit at this point where the

24   Defendant is now aware of the scope of the Government's

25   evidence against him and the gravity of the charges against

1    him, the likelihood that he would flee has increased.

2              THE COURT:  He did self-surrender, though.

3              MS. DOHRMANN:  Yes, Your Honor, certainly.

4    However, at that time he did not know what the Government's

5    evidence was or the exact nature of the charges against him.

6              THE COURT:  Okay.  As to the danger to the

7    community prong.  Obviously, the Court of Appeals made it

8    quite clear in Munchel that the Government has to have a

9    specific articulable threat that the Defendant poses.

10             Can you tell me exactly what the Government's

11   position is as to the threat that the Government's relying

12   on and, of course, talk to me about the evidence you are

13   relying on to say that that threat is sufficiently serious

14   and that there is a risk of that threat that can't be

15   mitigated through any set of conditions?

16             MS. DOHRMANN:  Certainly, Your Honor.  And the

17   Government would point to Magistrate Judge Faruqui's order.

18   We think he got it right in that the ongoing threat here is

19   that the Defendant attempted through violent means against

20   law enforcement officers to prevent the legitimate

21   government processes that he disagreed with.

22             Despite his efforts, which were successful in that

23   the police line was breached and the Capitol was breached

24   and people's lives were put into danger.  Ultimately, he

25   wasn't successful in the sense that that legitimate process

1    did proceed and a government that apparently he disagrees

2    with has been installed.

3            Your Honor, the Government's position is that

4    given the Defendant's capacity and willingness to engage in

5    repeated and quite unflinching violence against law

6    enforcement officers, during that one legitimate process

7    that he disagreed with, and now that a government that he

8    apparently disagrees with has been installed, the

9    Government's position is that there is a real and ongoing

10   danger that he will do that again.  And the danger is to law

11   enforcement officials, particularly or perhaps anyone who

12   would potentially interfere with his attempts to interfere.

13           THE COURT:  So the Government is arguing that Mr.

14   McKellop is a threat to the community generally, to people

15   in his town.  It's a narrower concern.  It's that he is a

16   potential threat to law enforcement officers or people now

17   in the executive branch post inauguration?

18           MS. DOHRMANN:  No, Your Honor.

19           If I conveyed it that narrowly, that was

20   incorrect.  The threat, Your Honor, is against anyone who in

21   this case was law enforcement officers who would essentially

22   be defending or attempting to prevent his interference with

23   whatever manner of activity that he believes is incorrect.

24   He is going to enforce his will violently to -- against

25   anybody who is interfering with him trying to interfere.

1      THE COURT:  So I guess I am now struggling with

2 this because -- so that means you have to show by clear and

3 convincing evidence that, I think, that he wants to engage

4 in some form of interference with the government; and that

5 if he does and someone tries to prevent that, he would

6 engage in violence against the people who try to interfere

7 with his interference.

8      What evidence do you have beyond the January 6th

9 events that you rely on to show that he is likely to try to

10 interfere with the new government; and that if he does

11 interfere or try to interfere with the government and

12 somebody else tries to prevent that, that he will engage in

13 violence against that person?

14      MS. DOHRMANN:  Sure, Your Honor.

15      Well, the Government's investigation is ongoing;

16 however, the Government did obtain evidence during its

17 search of the Defendant's primary residence as well as the

18 residence -- sort of a secondary residence or residence of

19 an associate, multiple military-grade weapons including an

20 illegal flash-bang type of device that was in his kitchen

21 drawer readily accessible and in no way particularly

22 protected, clearly with the intent to use it as needed.

23      Your Honor, the Government would also note that

24 the Defendant held on to all of the tactical gear, including

25 a gas mask that he used in the January 6th events.  Those

1    items were also recovered.

2              THE COURT:  Why wouldn't house arrest with GPS

3    bracelet and whatever -- I imagine the maximum protective

4    set of conditions that I could apply, why wouldn't that

5    sufficiently mitigate the threat as you articulated it

6    today?

7              MS. DOHRMANN:  Your Honor, so let me add a little

8    more to what I articulated.

9              We also have in this Defendant an individual who

10   came prepared for exactly what he did, which is this:

11   Attempt to disarm and disable law enforcement officers whose

12   primary source of defense of the Capitol at the time was

13   riot control spray.  He is prepared with a gas mask, which

14   he donned at the time of approaching the police line where,

15   again, riot control spray was being used by these officers

16   as non-violent means to defend the Capitol from attack.  The

17   Defendant then proceeded to attack officers attempting to

18   deploy it.

19             Your Honor has the memorandum where you can

20   actually see on body worn camera camera the Defendant tried

21   to grab a can of riot control spray out of an officer's

22   hand.  All of this to say there is a strategy and planning

23   here that the Government is very concerned about and that

24   GPS and house arrest would absolutely not address.

25             THE COURT:  Thank you.  Mr. Pertiz, how would you

1     respond to Ms. Dohrmann's argument?

2          MR. PERTIZ:  Yes, Your Honor.

3          As to the specific threat, I don't believe the

4     Government's argument holds water in that a number of events

5     since January 6th occurred that continued forward on the

6     path of the President, President Biden, being put in office

7     and governing this nation, including -- and certainly on

8     January 20th when he was inaugurated.  There was no evidence

9     that Mr. McKellop traveled to D.C. or attempted to interfere

10    with that or anyone else for that matter.

11         Many votes have occurred within Congress since

12    that time and again there is no evidence that Mr. McKellop

13    came to D.C. to interfere with any of that or any other

14    function of government that has occurred before January 6th

15    or after January 6th.

16         So I don't believe that there is a specific threat

17    that they can point to for Mr. McKellop that he would, in

18    fact, commit any further crimes or interfere with any

19    further acts of government.  And I certainly think there

20    aren't necessarily any more acts we can think of at this

21    point in time that would be something similar to January 6th

22    would want to continue to be obstructionist related to.

23         THE COURT:  Well, I think that's probably going

24    too far, in theory at least.

25         MR. PERTIZ:  Yes, Your Honor.

1          THE COURT:  Every day of the administration

2     someone thinks is illegitimate presents the opportunity for

3     someone to make mischief.

4          MR. PERTIZ:  I think that goes both ways.  He was

5     out on custody prior to his arrest two months since -- just

6     under two months from the time the President was

7     inaugurated.  There is no evidence of anything occurring

8     during that point in time.

9          The Government also pointed to the fact that Mr.

10    McKellop held on to the riot gear, the tactical gear he was

11    wearing on the day in question.  I find that interesting.

12    It allows them to argue it both ways.  If we look at

13    Chrestman, Your Honor, the Government argued and the Court

14    held that because they didn't find the tactical gear, they

15    were destroying evidence.  It is clearly a problem.  Now we

16    are arguing if he held onto the gear that's a problem too.

17    There's nothing illegal about the gas mask.  Nothing illegal

18    about the vest he was wearing or any of the clothing he was

19    wearing.  So I don't believe that we can say that -- it

20    seems disingenuous to argue that regardless of why you have

21    it or when you obtained it, if you still have it after

22    January 6th, it's a problem.  If you don't have it anymore

23    after January 6th, it's a problem.  I think it's

24    disingenuous and an issue.

25          The Government also argued about there being a

1   level of strategy and planning.  I believe Your Honor read
2   the affidavit we presented in our memorandum about what led
3   Mr. McKellop to appear that day on the individuals in
4   question went to attend a rally for President Trump at the
5   time.  They were concerned about counter-protestors.  This
6   is what occurred after that.  The events that occurred after
7   the rally for then President Donald Trump are what they are.
8   We can't say they are not.

9         Certainly I don't believe we can say that Mr.
10  McKellop actually went to that rally on that day with the
11  intent of obstructing Congress, when we have the individual
12  -- until this individual, who isn't involved, has not been
13  charged as far as I can tell, invited him to come.  So I
14  don't believe that there is a specific set of facts the
15  Government can point to.

16        I believe there are conditions this Court can
17  place on Mr. McKellop.  Certainly GPS monitoring,
18  surrendering all weapons not taken by the government
19  including -- which I assume it would have taken but if they
20  had not taken the particular flash-bang they claim existed,
21  that would ensure that Mr. McKellop is not a danger to the
22  community, could not participate in any of these
23  circumstances.  And I would note for Your Honor that Mr.
24  McKellop -- and his next-door-neighbor is a deputy in the
25  area.  It's certainly a leveling we can rely on and use to

1     our advantage if we need to.

2            I believe Mr. McKellop is not a flight risk.  I

3     believe he has shown that with his self-surrender.  I

4     believe his character is such the fact that he is a lack of

5     a danger to the community.  I believe those factors weigh

6     heavily in these circumstances, and I believe Mr. McKellop

7     would not be a danger to the community if released.

8            THE COURT:  Thank you, Counsel.

9            I am going to take a recess to consider this.  I

10    intend to issue my order orally following the recess.  What

11    that means on my end is I will stop the video and mute you.

12    I will let Ms. Lesley know when I am intending to come back

13    to give people about a minute's notice.  I don't intend this

14    to be a long recess.  Something in the nature of 5 to 10

15    minutes, but that's how we are going to proceed.  So as I

16    mentioned, I will let Ms. Lesley know and she can give

17    everyone a warning when I come back.

18            (Break.)

19            THE COURT:  Can everyone hear me?

20            COURTROOM DEPUTY:  Yes, Your Honor.  We are now

21    back on the record.

22            THE COURT:  Thank you, Ms. Lesley.

23            After considering the parties' arguments and

24    filings, their representations at this hearing, and entire

25    record of the case, including the four videos that the

1    Government has relied on as exhibits, I find the following

2    regarding the detention question here:

3            First, I do not believe that detention would be

4    warranted here on the risk of flight grounds, principally

5    because Mr. McKellop did self-surrender and for various

6    other reasons.  I do not think that he would be a risk of

7    flight if he were permitted to be released before trial.  I

8    think the harder question is whether there is any set of

9    conditions that could assure the safety of the community if

10   he were released.

11           As to that question I, of course, have to consider

12   four factors.  I will go through them in order.  The first

13   is the nature and circumstances of the charged offense.  As

14   for that first factor, Mr. McKellop violently assaulted

15   multiple law enforcement officers with a deadly weapon and

16   inflicted bodily injury on January 6th.  He was not a

17   peaceful protestor suddenly swept up in the moment.  He was

18   armed and apparently ready to fight.  He arrived at the

19   Capitol wearing tactical vest, helmet and gas mask.

20           During the events at issue, at least for part of

21   the time, he carried a flag pole, which he swung at least

22   once and treated like a spear or javelin.  He physically

23   assaulted multiple officers, as reflected in the videos that

24   I have watched.  The Government has proffered body camera

25   footage showing Mr. McKellop shoving and punching officers.

In one instance he stabbed at officers with the flag pole
and hurled it and the pole struck an officer in the face who
suffered a laceration and bleeding.  While assaulting a line
of officers, Mr. McKellop attempted to seize riot control
spray and defiantly gave the officers the middle finger.

He claims he arrived in tractcal gear to protect
himself from counter-protestors; and that may very well be
the case, but on the day of the riots he used that gear to
protect himself from crowd control spray, from law
enforcement officers, so that he could violently assault and
obstruct the officers who protected the Capitol.

In fact, the evidence before me was his engagement
was not with counter protestors but law enforcement
officers, in fact, wearing jackets well-marked as law
enforcement officers.

Mr. McKellop contends his attacks were not
coordinated or planned with others but took place only over
the course of a couple of minutes; and while they gave rise
to felony offenses that are also crimes of violence, do not
necessarily depict an intent to enter the Capitol building.
It may be the case but his willingness to engage with the
functional equivalence of a spear is serious nonetheless.
The one officer sustained injuries still visable much later.
Things could have gone much, much worse for that officer.

Judge Faruqui stated violent actions are among the

1   more egregious acts yet identified in these cases that are

2   pending in this court and I agree.  This factor, in my view,

3   weighs in favor of detention.

4          As to history and characteristics, Mr. McKellop

5   has no prior criminal history and is a highly-trained

6   military veteran who apparently served with distinction.

7   Unfortunately, he also appears to have employed that

8   training to disable and attempt to disarm Capitol police

9   officers.

10          He served 22 and a half years active duty in the

11   United States Army, in which he swore to take an oath to the

12   Constitution and was granted a privilege of high-level

13   security clearance.  Over that time he received

14   close-quarters combat training.  While he relies on those

15   facts to argue he should be released pre-trial, my view is

16   he abused his training and position of trust by working to

17   tear down the very democracy he once swore to defend.

18          Frankly, notwithstanding his background in the

19   military, he ignored what appeared to be quite lawful orders

20   from law enforcement officers who were clearly law

21   enforcement officers and instead attacked them.  Based on

22   this evidence in my view his history and characteristic

23   weigh in favor of detention.

24          I don't think I need to pause very long on the

25   weight of the evidence because the weight of the evidence

1    against Mr. McKellop is strong as to the charges that he

2    faces today.  The Government has proffered recordings from

3    multiple body-worn cameras, as I said, showing Mr. McKellop

4    assaulting officers.  Those recordings were corroborated by

5    law enforcement.  Mr. McKellop committed the crimes accused.

6    The weight of the evidence weighs in favor of detention.

7         It gets us to the fourth factor, which is frankly

8    the hardest factor, and in some respects is the question

9    here which is whether the release of Defendant with probably

10   the most stringent conditions that could apply would be

11   sufficient to ensure the safety of the community.  As the

12   D.C. Circuit has made very clear recently, the question is

13   what is the identifiable and articulable threat that Mr.

14   McKellop's release would pose?

15        I conclude in my view, the threat is that he would

16   engage in future violence or future physical altercations

17   with law enforcement.  I think that is an identifiable and

18   articulable threat.  And then the question is, are there a

19   series of conditions that could assure that that threat will

20   not come to pass?  And in my view there is no set of

21   conditions that could apply here, and therefore he should be

22   detained.

23        In addition to the various facts that I've already

24   gone through during a search of Mr. McKellop's residences

25   and vehicles, officers also recovered a flash-bang device

1    and multiple firearms.  In light of the possession of those

2    items, the extensive military training Mr. McKellop had,

3    conduct on January 6th and all of the other reasons

4    discussed, and based on all of the other evidence here

5    established Mr. McKellop has an increased capacity to harm

6    members of the law enforcement community.  His flagrant

7    disregard for the law on January 6th demonstrates there is a

8    risk he could put the community in in the future, his

9    seasoned combat training towards unlawful ends, especially

10   in connection with engagement with law enforcement.  In my

11   view therefore the fourth factor weighs on detention.

12          For all of these reasons and upon consideration of

13   the evidence presented the factors set forth in 18 US Code

14   Section 3142(g), as set forth in Section 3142(c), I find by

15   clear and convincing evidence the Defendant's pre-trial

16   release would constitute an unreasonable danger to the

17   community and that no condition or combination of conditions

18   would impose the safety of the community were he to be

19   released pending trial; and I, therefore, deny Mr.

20   McKellop's motion and order that Mr. McKellop shall remain

21   detained pending trial.

22          With that, Counsel, are there other topics that we

23   should discuss today to include the future proceedings in

24   this matter?  Ms. Dohrmann?

25          MS. DOHRMANN:  Yes, Your Honor.

1            Counsel and the Government have not discussed this

2     ahead of time, but the Government's proposal would be that

3     we set a date approximately 45 to 60 days from now with the

4     purpose being for discovery, which as I'm sure Your Honor is

5     very well aware is ample and can be somewhat complex to

6     provide and, of course, for the defense to review as well as

7     to have further discussions between counsel about any

8     potential resolution or further developments in this case.

9     For that reason, the Government would argue that the

10    interests of justice outweigh the Defendant and the public's

11    interest in a speedy trial, so the time could be excluded.

12            THE COURT:  Thank you.

13            Mr. Pertiz, you obviously haven't discussed that

14    question either with your client very likely or the

15    Government, but do you have a view of next steps when it

16    would be appropriate to hold the status conference, and to

17    what extent he can exclude time under the Speedy Trial Act?

18            MR. PERTIZ:  Your Honor, I would inform the Court

19    at this time that it is due to the situation that Mr.

20    McKellop finds himself in financially, we will be filing a

21    motion to withdraw and request court-appointed counsel.  So

22    I would ask for a short-term status date that would allow

23    for that motion to be filed and for Mr. McKellop to be

24    appointed counsel who can properly address that issue.

25            I have the motion prepared to file.  Given how

1    quickly this detention hearing was scheduled, I didn't want

2    to prejudice Mr. McKellop.  We discussed it in advance so I

3    have the motion prepared and the order prepared for filing,

4    and I can do that as soon as we are off of this hearing, if

5    the Court would like, and if we can set a short status date

6    that will give the Court an opportunity to appoint counsel

7    and get them up to speed to where we are now.

8              THE COURT:  Ms. Dohrmann, do you have any --

9              MS. DOHRMANN:  [Inaudible] -- thank you.

10             THE COURT:  When do you think you will be filing

11   that motion, Mr. Pertiz?

12             MR. PERTIZ:  By close of business, Your Honor.  I

13   should be able to act on that quite quickly.

14             THE COURT:  Then I would like to have new counsel

15   involved for the next status.  I think there is a little bit

16   of time to work there.  So I'd like to set another status

17   conference for April 12th at 2:00 p.m.  Mr. Pertiz, your

18   schedule will be less relevant at that point.  Ms. Dohrmann

19   and Mr. Honold, is 2:00 p.m. on April 12th doable?

20             MS. DOHRMANN:  Yes, Your Honor.  Thank you.

21             THE COURT:  Okay.  I think there's no reason yet

22   to take up the broader question of the 45- to 60-day Speedy

23   Trial Act.  The question I will say for the Government's

24   knowledge or information I have been disinclined to grant a

25   60-day continuance in other cases with a detained Defendant

1    where the Defendant opposes, but instead to do a shorter

2    period to make sure that the case proceeds and that the

3    Government just doesn't get 60 days with respect to detained

4    Defendants.

5              We can obviously take that question up on April

6    12, but I may very well conclude that it is much more

7    appropriate to take this in much smaller chunks because

8    while, obviously, I've decided that Mr. McKellop should be

9    detained pre-trial, that does put him in a very different

10   situation, vis-a-vis the speed of this case.  And I would

11   not want it to go as slowly as others, for people who have

12   not been detained.

13             Having said all of that, we will do -- I think

14   very likely -- a telephonic status conference, April 12th at

15   2:00 p.m.  I conclude that because of the forthcoming motion

16   to withdraw, the need to appoint counsel and because of the

17   likely discovery that will happen here, the fact that that

18   may be at least plea discussions, that it is appropriate to

19   exclude the time between today's date, April 5th, and next

20   week, April 12th, under the Speedy Trial Act, the interests

21   of justice outweigh the interests of the public and Mr.

22   McKellop in a speedy trial in that 7-day period.  We will

23   exclude Speedy Trial Act time for the next week.

24             Other topics we should discuss today, Counsel?

25             MS. DOHRMANN:  Not from the Government, Your

1    Honor.

2              THE COURT:  Thank you, Ms. Dohrmann.  Mr. Pertiz?

3              MR. PERTIZ:  Not from defense but I ask to be put

4    in a breakout room.

5              THE COURT:  Yes.  Ms. Lesley, can you please put

6    them in a breakout room?

7              COURTROOM DEPUTY:  Yes, Your Honor.

8              THE COURT:  Thank you, Counsel.

9              MR. PERTIZ:  Thank you, Your Honor.

10             MS. DOHRMANN:  Thank you, Your Honor.

11             (Proceedings concluded at 3:04 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

## **C E R T I F I C A T E**

2          I, **Lorraine T. Herman, Official Court Reporter,**

3    certify that the foregoing is a true and correct transcript

4    of the record of proceedings in the above-entitled matter.

5

6          **Please Note:**  This hearing occurred during the

7    COVID-19 pandemic and is therefore subject to the

8    technological limitations of court reporting remotely.

9

10

11

12    _____April 15, 2021_____          ___/s/_____

13             **DATE**                              **Lorraine T. Herman**

14

15

16

17

18

19

20

21

22

23

24

25