### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

                                        CR Action
                                        No. 1:21-268

      vs.                         Washington, DC
                                          October 25, 2021

JEFFREY MCKELLOP,

                                        3:00 p.m.

               Defendant.
_____/

TRANSCRIPT OF IN-PERSON MOTION HEARING
**BEFORE THE HONORABLE CARL J. NICHOLS**
UNITED STATES DISTRICT JUDGE

APPEARANCES:

**For the U.S.:**         **MARY DOHRMANN**
                         **DANIEL HONOLD**
                          U.S. ATTY'S OFC FOR D.C.
                          555 4th St, NW
                          Washington, DC 20530
                          202-252-7035

**For the Defendant:**     **CATHERINE HENRY**
                          **KATRINA YOUNG**
                          601 Walnut Street
                          Suite 540 West
                          Philadelphia, PA 19106
                          215-928-1100

Reported By:              LORRAINE T. HERMAN, RPR, CRC
                          Official Court Reporter
                          U.S. District & Bankruptcy Courts
                          333 Constitution Avenue, NW
                          Room 6720
                          Washington, DC 20001
                          202-354-3196

1

2                    **P R O C E E D I N G S**

3          **COURTROOM DEPUTY:**  This is criminal case year

4    2021-268, United States of America versus Jeffrey McKellop.

5    Pre-trial officer is Andre Sidbury.

6          Counsel, please come forward to introduce

7    yourselves for the record beginning with the government.

8          **THE COURT:**  And as is my practice at least, when

9    counsel approach the podium, you're free to take off your

10   mask.  I personally would prefer that because it's easier

11   for me to hear, the court reporter to hear, the courtroom

12   deputy and opposing counsel.  But then, when you're not at

13   the podium, please put your mask back on.

14         **MR. HONOLD:**  Good afternoon, Your Honor.  Daniel

15   Honold for the United States.

16         **THE COURT:**  Mr. Honold.

17         **MS. DOHRMANN:**  And good afternoon, Your Honor.

18   Mary Dohrmann on behalf of the United States as well.

19         **THE COURT:**  Ms. Dohrmann.

20         **MS. YOUNG:**  Good afternoon, Your Honor.  Katrina

21   Young from the federal defender of the Eastern District of

22   Pennsylvania on behalf of Mr. McKellop.

23         **THE COURT:**  Ms. Young.

24         **MS. HENRY:**  Good afternoon, Your Honor.  Catherine

25   Henry on behalf of Mr. McKellop.  Nice to see you.

1    **THE COURT:**  Nice to see you too.  I note that we

2    have the defendant, Mr. McKellop, in the courtroom.  Why

3    don't we just start with one very preliminary thing.

4    Ms. Young or Ms. Henry, does your client consent to

5    proceed -- well, I guess we're in person.  I was about to do

6    the Zoom where we consent to proceed by video.  I am so used

7    to that by now.

8         We're here on defendant's motion.  I've read the

9    papers.  Obviously, I had considered these questions back in

10   April, but I'm happy to hear from defense counsel first on

11   any argument you'd like to make.  I don't think you need to

12   belabor the facts.  I'm pretty familiar with them.  I do

13   have a couple particular questions, but please -- is it

14   going to be Ms. Young?

15        **MS. YOUNG:**  Yes, Your Honor.

16        **THE COURT:**  Please feel free to come forward.

17        **MS. YOUNG:**  Thank you, Your Honor.  And at this

18   juncture, based on the papers, like Your Honor said, I know

19   that Your Honor is probably well aware of the law that

20   controls here.

21        I think what I would like to focus on is two

22   things:  Number one, cases that I've been able to find

23   similar -- with similar facts as to Mr. McKellop where the

24   defendant has been released at this juncture.

25        **THE COURT:**  When you say "at this juncture", do

1    you mean in the January 6th cases --

2              **MS. YOUNG:**  Yes.

3              **THE COURT:**  -- where the district court judge has

4    first considered the detention question or where later,

5    after here six and a half months have passed, there's a

6    motion to essentially reconsider the question?

7              **MS. YOUNG:**  A mixture of both.

8              **THE COURT:**  Okay.

9              **MS. YOUNG:**  I have some that fall into either

10   category.  So I'll start with that, Your Honor.

11             I think probably the most on point to our facts

12   here is the case that's cited in our motion, *United States*

13   *versus Foy*.  That was a situation where it was not just the

14   magistrate court judge but, in fact, the District Court

15   judge that's assigned to his case who denied his initial

16   motion.

17             His motion was renewed a couple of months later by

18   counsel with additional information.  But I would note, the

19   additional information, as far as I can tell, seems to be

20   information that sort of gave more detail to the information

21   that was already given about him.

22             I know that part of the government's position is

23   that there's really been no change in circumstances

24   whatsoever.  So I bring up that point mainly because, as far

25   as I can tell in *Foy*, there was no changed circumstances to

1    the extent that the information that was provided didn't

2    present, you know, any new health conditions or things of

3    that nature that perhaps sometimes are brought up to a Court

4    in these situations.

5              What I would note, before I go further with *Foy*,

6    is I think the important -- with respect to any change in

7    circumstances, there's a significant change of circumstances

8    that I don't think any of us really predicted and that is

9    how long these cases are likely to go on.  And that's

10   because entirely because of the delay in getting out all of

11   the discovery.

12             And that is not in any way to disparage the

13   government.  I just think that it's important to note that I

14   don't think anyone sort of foresaw, for example, this

15   unprecedented need to have an outside body dealing with the

16   discovery and getting it to all of the parties.

17             At this juncture, in this case at least, we have

18   thousands and thousands and thousands of documents and hours

19   to go over.  And so the changed circumstances, Your Honor, I

20   mean, at this point, it's sort of as if, in a way,

21   Mr. McKellop is kind of being indefinitely detained in a

22   sense that --

23             **THE COURT:**  So why don't we just go to trial?

24             **MS. YOUNG:**  Say that again?

25             **THE COURT:**  Why don't we just go to trial?

1          **MS. YOUNG:**  Well, we don't have nearly all of the

2     discovery, I don't think, that the government is going to

3     provide to us that includes, as I understand it, potentially

4     exculpatory evidence.

5          **THE COURT:**  How do we know that question?  I guess

6     that's really a question for the government.  But my

7     understanding is there's obviously a swath of information

8     that the government is still in the process of making

9     available.  And I understand it's a time-consuming and

10    voluminous question.

11         But to at least for the government to have a *Brady*

12    obligation, does it need to know that there's exculpatory

13    information in that set of data that it is making available

14    in an individual case?

15         In other words, I understand the government wants

16    to make all of this information available to all defendants,

17    and it has a *Brady* obligation to make exculpatory

18    information available to particular defendants as to whom

19    there's exculpatory information, at least if it knows that.

20         Does the government have an obligation under *Brady*

21    to make all of these videos available before trial, if it

22    doesn't know that there's exculpatory information as to a

23    particular defendant?

24         **MS. YOUNG:**  I think with -- if it is reasonable,

25    if there's a reasonable likelihood that it does, I think

1        that it does need to, Your Honor.

2                **THE COURT:**  Is that true here?

3                **MS. YOUNG:**  Well, for example, one of the things I

4        would point out is there seems to be brand new information,

5        I think as of today, maybe yesterday, that there are

6        individuals who were in talks with people at the White House

7        prior to January 6th.

8                I'm not in any way saying that we will necessarily

9        raise this defense, but part of -- you know, one of the huge

10       considerations that we have to make here is who was calling

11       shots, who was telling people what to do and whether or not

12       that will apply to Mr. McKellop or any of the other

13       defendants in the case.  That's just one example of that's

14       information that has only come to light within the last, I

15       think, 24 or 48 hours.

16               **THE COURT:**  But you've been talking to your client

17       about whether such information could potentially be

18       exculpatory as to him.  It's not like you have to rely on

19       the government to know what your client's view of the world

20       is.

21               **MS. YOUNG:**  Certainly not.  What I'm saying is, as

22       Your Honor is aware, you're in a much different position if

23       you go to trial where you're doing something just entirely

24       based on your client's word --

25               **THE COURT:**  Yes.

1        **MS. YOUNG:**  -- and whether or not that's going to

2   be found credible in the position the defendant is in versus

3   if there's true, actual information that supports this

4   notion out there that only the government is privy to.

5        **THE COURT:**  Here are parts of the reasons I am

6   asking these questions.  I agree with you that, and I've

7   said it in, I think, this matter and in other matters, that

8   there seems to be a lot of pressure being placed on the

9   system where we are both detaining defendants and not

10  getting them all of the discovery the government says it

11  needs to produce and, as a result, delaying trials.

12       One solution seems to me to start doing the

13  trials, because then the cases at least don't just pend.

14  And so what I'm trying to understand is whether that's even

15  possible here.

16       Putting the *Brady* question aside, it sounds to me

17  like your view is you don't want to go to trial unless and

18  until the government has done a substantial amount of

19  additional production.  Correct?

20       **MS. YOUNG:**  Correct.  I don't think I would be

21  effective in doing so.  And that's the rock and the hard

22  place that I am between.  You know, I know that the

23  government and -- we certainly don't see eye to eye on this.

24  And perhaps Your Honor doesn't, but I would just note, you

25  know, it's not as if they were up against the statute of

1    limitations, for example.

2              At least in my experience the sort of typical

3    traditional way that the government will bring cases is its

4    investigation is done upfront.  It has sorted through all of

5    its discovery and what's *Brady* and what's not and what we're

6    entitled to and what's not upfront, and then the charges are

7    brought, at which point this notion of detention doesn't

8    entail, you know, the notion of we don't really know how

9    long it's going to take and how long this person is going to

10   have to wait for their trial.  So to some extent, I mean

11   there was a decision that was made.

12        **THE COURT:**  Has any judge in this district held

13   that release was required because of the length of this

14   discovery process?

15            **MS. YOUNG:**  Not to my knowledge, no.

16            I raise it solely, Your Honor, because if the

17   Court is looking for the --

18        **THE COURT:**  A changed circumstance.

19        **MS. YOUNG:**  -- some kind of changed circumstance

20   or some kind of difference from when Your Honor heard the

21   first motion --

22        **THE COURT:**  If we look at the statute at least

23   that the government has pointed me to as to the authority

24   for me to reopen the hearing and the question here, it seems

25   to me that it requires me to determine that information

1    exists that was not known to the movant at the time of the

2    hearing, and I think that's true.  We can assume

3    Mr. McKellop didn't know in April that it would take this

4    long for the information to be produced.

5            But it then -- that information must have a

6    material bearing on the issue whether there are conditions

7    of release that will reasonably assure the appearance or the

8    safety of any other person.  How does the discovery process

9    have anything to do with questions of detention and safety?

10           **MS. YOUNG:**  So, Your Honor, the position that

11   Mr. McKellop is in, because of not knowing if and when, you

12   know, this is going to get to a trial, it changes his

13   psychological state, his emotional state, with respect to

14   the detention that he's facing.

15           The reason -- and maybe I wasn't entirely clear

16   about this.  The reason that the seven months that he spent

17   in custody matters so much, when you juxtapose that with

18   still not knowing when and if he can get to trial, with

19   every day of that, he's having to think, okay -- to think

20   about his alleged actions, to think about what jail is doing

21   to him.  Keeping in mind that this is a person who's never

22   been incarcerated in his life.  And for that reason is

23   affected, I think, probably more so than a person who

24   perhaps has been incarcerated before.

25           It's not as if, for example -- I'll give the

1    example of a person who is detained pre-trial.  They have a

2    set trial date.  They know that's when they can go to trial.

3    And they have in their mind, Okay.  I'm going to go to

4    trial, and I'm going to win, and that's going to be the end

5    of it.  They are thinking to themselves, you know, it's just

6    a couple of more months, and they are not reflecting in any

7    way.  That's a different position to be in than the position

8    of a person who's really just sitting there, you know, kind

9    of wondering why -- when is this --

10         **THE COURT:**  What evidence do I have in front of me

11   about his present mental state and what you're describing

12   now?

13         **MS. YOUNG:**  It is my representation, Your Honor.

14   I am not certainly advising him to testify today.  I am not

15   going to do that, but I can represent to the Court, in my

16   discussions with him, there's been a clear sort of change,

17   understanding, et cetera, of how this is not a position that

18   he wants to be in, I mean, including crying.

19         And a lot of times that -- and I apologize, you

20   know, for bringing that up if that's embarrassing, but

21   including crying, Your Honor, thinking about being away from

22   his children, not knowing for how long that's going to take

23   place.  And I can represent at least to the Court it's had a

24   significant impact on him.

25         **THE COURT:**  Do you concede that I have to conclude

1    there is a changed circumstance?

2            **MS. YOUNG:**  I do not.  I do not.  I raise it only

3    because the government raises it, and if Your Honor is

4    looking for something.  That's why I bring up *Foy* is because

5    I don't see anything in that case.  And granted I am not the

6    attorney on that case, but I don't see anything that was

7    argued in terms of any kind of change in circumstances in

8    that case.  So, no, I don't think that Your Honor has to do

9    that.

10            If I may --

11            **THE COURT:**  Yes.

12            **MS. YOUNG:**  -- the facts of that case, that was a

13   defendant who was also former military.  He was a marine.

14   He had been in the service for five years.  Mr. McKellop was

15   shy of 23 years before he retired.  It was also a person

16   with no prior record, like Mr. McKellop.

17            And in that case, the facts of -- the alleged

18   facts of the case are that Mr. Foy threw unknown projectiles

19   at the police and then repeatedly swung and hit them with a

20   hockey stick, which he brought with him, which is an actual

21   -- I think we can all agree is, for purposes of bringing it

22   to a protest, a weapon.

23            Which is different for Mr. McKellop in the sense

24   that he brought a flag, which a lot of people did, and I

25   don't think brought it with the intent for it to be a

1   weapon.  Granted, I know what the alleged facts are and

2   perhaps a flag became a weapon, but he did not bring it with

3   that intent.

4          Also different in Mr. Foy's case is that he urged

5   others to enter the Capitol, and then he himself entered the

6   Capitol via a window.  Mr. McKellop never made such attempt,

7   as I stated in my motion.  The entirety of the charges

8   against him really come from about two-ish minutes and then

9   he left after it got to the point that it did.

10         Again, that's the same posture as we are here,

11  which is there was an initial motion before the District

12  Court and then a renewed motion.  Again, that I can see,

13  there was no changed circumstances whatsoever.  I think that

14  there was an elaboration by his counsel as to his military

15  credentials and that sort of thing.

16         In that case, the Court focused on the fact

17  specifically that there was no articulable threat posed by

18  the defendant at the time that the motion was renewed.  And

19  I think that's important, because I think what's kind of

20  getting lost in -- what's getting lost in these detention

21  arguments is there are some people who ended up in the

22  position --

23         Some of the January 6th individuals who ended up

24  in the position they were in, who had prior criminal records

25  or prior instances that could give a Court pause, meaning,

1    you know, this is a person who is likely to do this again.

2    This is a person who has found themselves in a different

3    position, and I'll highlight a couple of those in a second,

4    versus the individuals who, but for very weird, unusual

5    circumstances, that being this whole dispute about the

6    election and there being a rally held that day that

7    thousands of people went to.  But for those circumstances,

8    you would not see Mr. McKellop sitting here.  He has 55

9    years to prove that.

10           So what the Court has to look at is, if we can

11   have pretty, I think, decent certainty that something like

12   that is not likely to happen in the foreseeable future for a

13   lot of reasons, is he a threat to --

14           **THE COURT:**  But I didn't rely on that.  My first

15   detention decision was I went through with the government

16   the specific articulable threat that the government was

17   arguing in that, and I had reached a conclusion that it was

18   about future potential engagement with law enforcement, not

19   another January 6th-like event.

20           I agree with you.  I sure hope there isn't about

21   to be another January 6th event.

22           **MS. YOUNG:**  Right.

23           **THE COURT:**  But that's not what I relied on the

24   first time.  I agreed that another January 6th-like event

25   was unlikely, but the specific articulable threat that I

went through on the record was about the risk of violence or
at least physical confrontation as between Mr. McKellop and
law enforcement in the future.

**MS. YOUNG:**  And I don't see -- oh, sorry.

**THE COURT:**  So it doesn't move the needle with me
to say there isn't going to be another January 6th event.  I
agree with that.

**MS. YOUNG:**  Well, I don't see any evidence that
there would be any.  I mean I guess I'm missing the evidence
of where there would be any --

**THE COURT:**  The government now argues that, in
addition to what was before me at the time, that
Mr. McKellop has acted in erratic and maybe aggressive ways
as it relates to hearings in this matter.  So they say you
were right to detain him in April for the reasons you did.

And, to the extent that there is any new
information about Mr. McKellop, it actually cuts against him
because, unlike other defendants, he's acted erratically or
aggressively as it relates to the court proceeding, which
suggests, one would argue -- I'm not saying I agree with
this.  I'm just talking about the government's argument that
he's got an issue with authority right now.

**MS. YOUNG:**  And I don't think I would characterize
it as erratic or aggressive.  I think frustrated is a much
better way to term how he has felt on those calls.  I think,

1    to some extent, it has to do with his attorney.  We can't

2    give him answers about very specific questions he has, like

3    when can we resolve this, you know, that sort of thing.

4    And, again, he's not a person who has been in this position

5    before.  It's very difficult, Your Honor, to be away from

6    him in a different district and not --

7              **THE COURT:**  So we discussed that question before.

8              **MS. YOUNG:**  Yes.

9              **THE COURT:**  But it seems to me that much of the

10   argument you're making today isn't really dependent on his

11   physical location, because it's not so much about the

12   D.C. jail.  It's about the fact that trial is going to be

13   some time in the future, because moving him to Philadelphia,

14   for example, wouldn't solve the problem of when a trial here

15   might be ready to go.

16             **MS. YOUNG:**  That's right.  I mean, I guess in the

17   alternative, it would certainly still be easier for him to

18   be in Philadelphia, but I think given -- you know, when we

19   first raised this issue with the Court, we certainly had no

20   idea how long this process was going to take.  So that's

21   really why we're in the position of asking for release

22   versus transfer instead.

23             So, I mean, we have certainly discussed that.  We

24   came in here ready to, you know, wanting to apologize to the

25   Court.  I've obviously advised him not to speak at this

1    point but to apologize to the Court for his frustration on

2    that phone call.

3              But there's no -- I mean, he was in the military

4    for all of those years and was clearly taking orders and had

5    no problem with that.

6              **THE COURT:**  But that's the -- I mean, here's one

7    of my many problems with this matter is that really does cut

8    both ways because one would think that someone who respects

9    the rule of law wouldn't swing a flag with a pointy tip at a

10   police officer's face and cut them and then throw it like a

11   spear.

12             Maybe some random person who never had, you know,

13   had authority figures in their life or didn't have to work

14   -- look, I should say, I really credit Mr. McKellop's

15   military service.  It's quite remarkable, and I thank him

16   for it.  But in some ways, that suggests he's the kind of

17   person who should have known better.  And that's one reason

18   that I was, in some ways, more concerned with what happened

19   that day than I might have been if it was just some random

20   person.

21             **MS. YOUNG:**  And I don't necessarily disagree with

22   you, Your Honor, that he's a person who probably should have

23   known better.  I don't think he disagrees with you at this

24   point.  But at the end of the day, you kind of have to -- as

25   much as we don't want to and we want to kind of view only

1    what he should have done, at the end of the day thousands

2    and thousands of people made really bad decisions.

3            So the question becomes, is that predictive?  Is a

4    single day, is a single act, predictive of future behavior?

5    Now that he's had seven months to, you know, be in a

6    position that he never thought he was going to be in, under

7    pretty terrible circumstances.  I don't need to I think go

8    into huge detail about the conditions at the D.C. jail.

9            **THE COURT:**  I'm well aware.

10           **MS. YOUNG:**  I'm sorry?

11           **THE COURT:**  I'm well aware.

12           **MS. YOUNG:**  Right.  I think that it's not a place

13   that he wants to be, and there's nothing to indicate that

14   he's part of some extremist group or has some kind of

15   radical political views where he's going to get out and go

16   right back to that.  He was never there to begin with.  He

17   went down there on a whim with a friend who asked him to,

18   who has sworn out an affidavit letting this Court know that

19   he was the one who asked him to go down there.

20           I think that, you know, it is not within the

21   parameters of the Bail Reform Act to say, you know, we are

22   only going to look at what he did and nothing else when

23   we're not talking about a presumption case.

24           That's why we have presumption cases where there

25   are certain acts.  There are certain charges.  There are

1    certain circumstances under which it is a presumption that

2    that alone, that the alleged conduct alone, gets you

3    detained unless there is something else.  We are not in that

4    position, Your Honor.  So that's kind of where we are in

5    terms of looking at what happened that day.

6            I understand that the military service cuts both

7    ways or can cut both ways.  But interestingly, you know, in

8    the cases at least that I've found where the person was

9    former military, there's a question -- for example, Foy,

10   which I just cited, it was the military experience, the

11   military background that ended up carrying the day for that

12   defendant in getting him released.

13           The only case that I am aware of where a Court

14   sort of implied that the military background or experience

15   cut against the defendant was a case where -- if I may just

16   find it -- *U.S. v. Padilla*, which I think the government

17   cited as well.

18           It was a defendant who was an Iraq war veteran but

19   who was receiving disability prior to his arrest and had

20   been diagnosed with PTSD.  And I think what the Court was

21   getting at in that case is that there were maybe some mental

22   health issues that were of concern.  We don't have that in

23   this case.  There is no evidence of that in this case, Your

24   Honor.

25           Other cases that I think should be considered by

1     the Court, *U.S. versus Sanford*, which is not in my motion.

2     It was a recent case that I found.  It was a 55-year-old,

3     retired, Chester firefighter, arguably law enforcement

4     himself, who took with him to the rally a fire extinguisher

5     and hurled it at an officer.  Struck the officer in the

6     head.

7             Luckily that person was wearing a helmet.  It

8     bounced off of that officer's helmet, hit a second officer

9     who was not wearing a helmet, ricocheted off of that person

10    and then hit a third officer.  Mr. Sanford was released to a

11    third party.  I think it was specifically his wife in that

12    case on strict conditions.

13            *United States versus Blair*, the defendant in that

14    case allegedly struck an officer with a lacrosse stick that

15    he took to the rally.  To it was attached a confederate flag

16    and then, when agents went to his home to conduct a search

17    warrant, they found an AK-15.  He was released.

18            *United States versus Leffingwell*, is a 51-year-old

19    member of the Washington National Guard, also an Iraq war

20    veteran, broke into the Capitol and repeatedly punched an

21    officer in the head and chest.  He also was released on

22    strict conditions to a third-party custodian on ROR.

23            I have a couple more, Your Honor, if Your Honor

24    wants to hear about them.  I know that you were curious

25    about that.

1          **THE COURT:**  Yes.

2          **MS. YOUNG:**  Okay.  *United States versus Owens* was

3     a 21-year-old college student who hit an officer with a

4     skateboard, required medical attention, and then continued

5     swinging that skateboard trying to hit other officers.  He,

6     along with his father, breached the Capitol and he was

7     released.

8          *United States versus Alberts*, actually brought a

9     firearm to the rally, didn't use it, isn't accused, to my

10    knowledge, of assaulting officers but brought a firearm that

11    was loaded with a spare magazine to the rally and was

12    released on conditions.

13         And I would just note that, of the cases that the

14    government cites as being factually similar enough to

15    Mr. McKellop's, one of the things that's a consistent thread

16    in I believe all of them -- and I'll make sure I don't

17    misspeak but -- is that there was some prior conduct, be it

18    a criminal conviction or evidence that came to light as a

19    result of this investigation of the participant's prior

20    radical political actions.

21         For example, *United States versus Brown*, I think

22    is one that the government cited, was a case where he's 54

23    years old, had a fairly stable home life, was living with

24    his girlfriend.  He got together with a group.  They called

25    themselves the California Patriots.  They basically used

1       encrypted messaging and then came to D.C. on January 6th.

2               And what they found, once they did some sleuthing

3       online, is that prior to that in December of 2020, he was

4       going around California, I guess doing his own little

5       protests or whatever in various places, one of which was a

6       grocery store where he went in with a bullhorn, refused to

7       leave.  He was basically arguing with the manager about the

8       mask mandate and said that he wouldn't leave until police

9       showed up and escorted him out of there.  So there was

10      evidence that there was some kind of prior radicalization or

11      extremism on his part.

12              I believe they also cite *U.S. versus Dempsey*.  Not

13      included in the motion is the fact that previously that

14      defendant had been arrested in 2019 in California for taking

15      it on himself to take bear spray to an anti-Trump rally and

16      bear spray the protestors there.

17              *U.S. versus Fairland*, that defendant, who came to

18      the Capitol on 1/6, had convictions for unlawful possession

19      of a handgun, aggravated assault and simple assault.

20              *Fitzsimmons* is a case where the defendant in that

21      case, essentially his family wouldn't even vouch for him,

22      would not -- by the time he got arrested in this case,

23      wouldn't vouch for him at all because they had decided that

24      he had become so extreme that they didn't want anything to

25      do with him anymore, I think but for his mother.

1          And I've already talked about *Padilla*.  The

2     distinguishing, I think large distinguishing fact in that

3     case, two of them, are that, A, the question about his

4     mental health issues, but also, B, that his assaults on

5     multiple officers carried through approximately three hours

6     rather than about two minutes.

7          All of which is to say, Your Honor, Mr. McKellop,

8     I think, clearly falls into the group of individuals that I

9     have talked about who have been released versus detained.

10          Lastly, Your Honor, what I would point out is --

11     and I don't know because I was not counsel at the time of

12     the first motion -- whether it was brought to Your Honor's

13     attention that Mr. McKellop's uncle, Harry McKellop, who is

14     present in the courtroom today, is willing to be the

15     third-party custodian for Mr. McKellop, which is a common

16     vein that I found through the conditions of release in a lot

17     of these defendants.

18          Mr. McKellop is a Professor Emeritus from UCLA in

19     bioengineering and orthopedics.  He lives with his wife and

20     dog alone in northern California.  He would happily have

21     Mr. McKellop come live with him, essentially watch over him,

22     promise to the Court that, if at any point, any of the

23     strict conditions that I would hope this Court would impose

24     were violated, he would bring that to the Court's attention.

25          One of those, as Your Honor knows, is home

1    detention, which is a pretty, you know -- I think usually

2    does the trick.  I don't know that the government can really

3    point to too many instances where such a condition has been

4    violated in one of these, you know, 650 cases.  I guess it

5    would be about 580 that are not detained.

6                **THE COURT:**  Right.

7                **MS. YOUNG:**  So with all of that, Your Honor, I

8    would ask that you release him.

9                **THE COURT:**  Thank you.

10               **MS. YOUNG:**  Sure.

11               **THE COURT:**  I'll hear from the government now.

12   Mr. Honold, you can take the lead.

13               **MR. HONOLD:**  Thank you, Your Honor.

14               So I think we should start with the proper framing

15   of the legal question here, and it is as we lay out in our

16   opposition.  It is whether or not there is new material

17   information that was not available to the defendant at the

18   time.  Nothing that the Court has heard today or in the

19   papers constitutes such material that would be relevant or

20   not relevant but rather material to the question of the

21   defendant's dangerousness here.

22               As a result, the correct and carefully considered

23   decision that this Court made in April should stand.

24   There's really nothing that's been said or written that

25   would undermine that.

1            Rather, on the other side of the ledger, what's

2    come to light in the intervening months I think would

3    further justify the detention decision that this Court has

4    already made.

5            We've already talked about the conduct, the

6    behavior of the defendant before these court hearings,

7    during court hearings, including leaving one.  The defense

8    is not disputing that or does not appear to be disputing

9    that at this time.  That type of behavior I think clearly

10   evinces a lack of respect for authority and an ability to

11   control one's impulses that I think directly touch on future

12   dangerousness.

13           In addition -- and this was before new counsel

14   came on to represent the defendant, but it's interesting,

15   Your Honor.  A lot of what was made at the initial phases of

16   these detention decisions were two things:  One, the

17   defendant's supposed cooperativeness in turning himself in

18   on the warrant and providing his cell phone; and two, the

19   fact that the government waited all the way from January 6th

20   until I believe it was March 17th, to effectuate this

21   arrest.  And how, if the government had really believed that

22   this defendant was a danger, how could they not have acted

23   sooner?

24           Well, a couple things have come to light, Your

25   Honor.  One, I just heard my colleague say that perhaps the

1    better course here would have been to wait until all

2    discovery had been finalized to effectuate this arrest and

3    bring this case to light, so arguing that the arrest should

4    have been effectuated later and not sooner, as the original

5    position had been.

6           Second, as we lay out in our opposition, there is

7    evidence that this defendant has obliterated evidence that

8    would be relevant to his participation and his thoughts

9    surrounding the January 6th events.  There is information

10   from search warrant returns conducted on both his phone,

11   which he turned in in a supposed sign of cooperation, and

12   his iCloud account, both of which are missing critical time

13   periods of data that seem to have been wiped almost as if on

14   purpose, almost as if in a time frame that directly impacts

15   on the most relevant windows of this event, January 6th to

16   early February, right when BOLO 215 came out and the

17   defendant became aware of what the government had on him.

18          That is not cooperation.  That is not

19   understanding the severity of one's offenses, and that is

20   not a show of remorse, as has been argued or attempted to be

21   argued by the defense throughout.  That type of conduct

22   significantly undercuts all of those qualities that the

23   defense had previously argued would justify release that

24   simply are not present here.

25          **THE COURT:**  It seems to me that the most

1    complicated thing about this matter as it presently exists

2    is that, unlike traditional or most criminal cases with

3    detained defendants that progress pretty quickly or at least

4    there's the possibility that they can, this one is

5    essentially languishing.  I'm not suggesting it's anyone's

6    fault.  It just seems to me to be a fact.

7        One question, of course, is a legal one whether I

8    can even consider that under the relevant analysis.  But if

9    I can, what do I make of that?

10       I am curious for your review of the questions I

11   asked defense counsel about government's *Brady* obligation,

12   and why don't we just go to trial, and it sounds to me like

13   the defendant doesn't want to go to trial now, but the

14   government may not either.

15       But that is, and I've said this in this hearing

16   and in other hearings, both about detention generally and

17   about the way that discovery can occur at the D.C. jail,

18   that there's a lot of pressure being placed on detention

19   when we're not ready to roll.  So at what point are we going

20   to be able to have a trial in this case?

21       There is a presumption against pre-trial

22   detention.  The trial is what this case is about.

23   Obviously, if there is a non-trial resolution, we'll do it.

24   But it doesn't seem to me that I can even make a reasonable

25   prediction about when this trial will happen.  If that's the

1    case, don't I at least need to be thinking about that when I

2    consider whether Mr. McKellop should be detained or should

3    go on the most restrictive possible set of home detention

4    conditions I can impose?

5              **MR. HONOLD:**  Yes, Your Honor.

6              A lot there.  I'll just respectfully disagree with

7    the notion that this case and other January 6th cases are

8    languishing.  We do have significant discovery obligations

9    in this case.

10             It's a case -- it's a series of cases that both

11   require an immediate and intensive law enforcement response

12   to a more or less historically unprecedented incident that

13   occurred at the heart of our democracy in our nation's

14   Capitol involving a large number of people, potentially a

15   large number of interrelated people.

16             And as a result, an overlapping set of discovery

17   obligations, and the collection of such a massive amount of

18   electronic and documentary and interviews and other types of

19   evidence where we're operating on a scale that is -- I think

20   it's unique.  I think it's almost qualitatively different

21   from, you know, what this Court would see in a typical case

22   where there would be pre-trial detention and we'd be moving

23   to trial a little bit more quickly.

24             It's certainly not a situation in which the

25   government could have or, let alone, should have afforded to

1    wait until it had collected all of the surveillance footage

2    and all of the potential, you know, Stored Communications

3    Act warrants that it possibly could before arresting anybody

4    in this case.  That simply can't be the answer here.

5          There is too much of a security risk.  There is

6    too much of a threat of dangerousness from this defendant

7    and other defendants that are similarly situated to him for

8    that to be the answer.

9          **THE COURT:**  If we had known in April what the arc

10   of this case would be -- and I don't mean to suggest, when I

11   use the term languish, that the government is doing anything

12   other than working really hard.  I just mean that this case

13   has been pending for roughly seven months, and we can't set

14   a trial date.

15         But if I had known in April that that was where we

16   would be on October 25th, would that fact have been

17   something I could have even taken into consideration in

18   April when deciding whether Mr. McKellop should be detained?

19         **MS. DOHRMANN:**  I would argue, as a legal matter,

20   no.  Those kinds of claims, like significant pre-trial

21   delays, those sound in due process considerations.  Those

22   are not the 3142(g) factors that this Court does and must

23   consider when making these detention decisions.

24         I think that, to fight the hypo a little bit, we

25   all had a pretty good sense that this was going to be a

1    significant and involved discovery process, investigation,

2    getting all of the relevant information to defense in a

3    usable and manageable way, and it's something that we are

4    still working on.

5           I think that that was fairly clear to most of us

6    even in April.  I understand that neither -- I understand

7    the Court's position in noting that neither party is really

8    asking for a trial date, even now on October 25th of 2021.

9    But that really doesn't have a bearing on the legal analysis

10   that the Court's required to make.

11          And so that's why we keep coming back to you just

12   pointing out the fact that there are no changed

13   circumstances.  There is no new material information that

14   bears on this defendant's dangerousness, which is what the

15   ultimate question here is.

16          So I think that brings us sort of into looking at

17   the other defendants, potentially, if the Court's interested

18   in doing that.  I think really what the Court ultimately has

19   to do is make the individualized determination that it did.

20          None of the cases that the defense has pointed out

21   or that we've cited to are really knock down, drag out, you

22   know, you must release Jeffrey McKellop because this person

23   was also released.

24          There are distinguishing and mitigating factors in

25   all of these cases, including in *Foy*.  I think it's worth

1    pointing out in *Foy*, if we're talking about -- I think what

2    really opens the door there in *Fo*y if we are talking about

3    changed circumstances, there is really a general

4    understanding it seems between the Court and the parties

5    that the Court employed a presumption that it shouldn't have

6    employed in the first instance and that's why it came back.

7          The Court was asking itself what would I have done

8    as the Court had I not employed that presumption in the

9    first place.  So this is really not the same posture that

10   we're in where there is no claim of legal error and the

11   government can discern none in what this Court did in making

12   that individualized determination in the first place.

13         So *Foy* really doesn't control on the law, and it

14   doesn't really control on the facts either.  The severity of

15   the injuries, from what I can glean in the decision that was

16   put out, don't really seem to rise to the level of what this

17   defendant inflicted -- and I know the Court has seen

18   Government's Exhibits 1 through 4 that we presented in this

19   case -- the severity of them.

20         And I think this was actually Judge Faruqui that

21   pointed this out but, even though it's two and a half

22   minutes, there are breaks in it.  The defendant does have

23   the ability to reconsider what he's doing.  So it doesn't

24   really matter that this didn't take place over two and a

25   half hours, three hours, what have you.  He had multiple

1    opportunities to reconsider what he was doing.  And each

2    time he said, No, I am going to keep going.  That is also

3    what can allow Your Honor to predict that future

4    dangerousness that the Court already did.  This is not a

5    one-off assault.

6            This is assault on four officers, multiple

7    charges, multiple instances of assaultive conduct with

8    breaks in between where a rational human would sit back and

9    assess the consequences of what he or she had just done and

10   hopefully realize the mistake, but that's not what he did.

11   So that's where this Court fell in this calculus, I believe.

12          **THE COURT:**  With respect to trial, do you know

13   what the government's view is on the *Brady* question that I

14   was asking earlier of defense counsel?

15          **MR. HONOLD:**  I'm hesitant to take a specific

16   position with respect to this particular defendant.  Part of

17   why the government is so hesitant is because of the sheer

18   volume.  We just can't say for sure one way or the other --

19          **THE COURT:**  I guess what I'm asking is on the

20   legal question.  And, again, you're free to fight the hypo,

21   but you have a vast swath of information that may or may not

22   have video about lots and lots of different people and as to

23   which the government maybe hasn't even reviewed all of the

24   information.  I don't know.

25          Does the government believe it has a *Brady*

1    obligation to disclose that information to every defendant

2    because of the possibility that there might be exculpatory

3    information in it or is it more particularized and specific

4    than that?

5           **MR. HONOLD:**  Again, I'm not sure I have a

6    definitive answer as to whether or not that's going to

7    qualify as *Brady* in all cases.  The reason that we're, I

8    think, interested in doing it in all cases is the

9    possibility that there could be some potential *Brady*

10   information as to any given defendant in that large trench

11   of discovery that we intend to make available to the defense

12   and that we are, stepwise, making it available to the

13   defense.

14          Again, I can't say specifically with respect to

15   this defendant, Jeffrey McKellop, whether or not any such

16   information in those large-scale disclosures is going to be

17   *Brady* information as to him, but we are making it available.

18          **THE COURT:**  But, I mean, I guess we've already

19   said this but not really sure sitting here today when that

20   will be complete and, therefore, when this case will be

21   ready to go to trial?

22          **MR. HONOLD:**  That's correct, Your Honor.

23          **THE COURT:**  Does the government have even a

24   back-of-the-envelope prediction?  I'm sure you love that

25   question.

1      **MR. HONOLD:**  I didn't come here prepared with a

2  back-of-the-envelope, Your Honor, and I'm sorry for that.

3  The best I can say is that we are working really hard on

4  this question, and I think the Court can take some comfort

5  in the fact that neither party, at this point, is asking for

6  a trial date.

7      If it were in a different posture, the landscape

8  would maybe look a little bit different in terms of what the

9  Court is asking.  I think we're sort of in alignment here in

10  that we want to investigate this case thoroughly.  They want

11  to investigate their case thoroughly and be able to bring

12  this to trial in the best possible light.

13      **THE COURT:**  This came up before in this case,

14  obviously, and I asked defense counsel about it a little

15  bit.  Does the government have a view about whether -- and

16  this would not be at all a solution to most of the concerns

17  defense counsel has raised, but whether it would be

18  appropriate to, in light of the issues with discovery at

19  D.C. jail, to move Mr. McKellop to Philadelphia?

20      It hasn't been briefed.  I have been told that

21  there are complications with even such an outcome, and I'm

22  not sure I want to wade into it.  But I was just curious for

23  the prosecution's perspective on whether that would be an

24  appropriate alternative order.

25      **MR. HONOLD:**  Having not had the opportunity to

1    brief it, Your Honor, my initial reaction would be to

2    oppose.  The defendant's -- I just don't see the relevance

3    of the defendant's counsel's locus as to where he should be

4    situated.  He should be situated, it seems to me, in the

5    place where he committed the crime, where the venue is,

6    where the trial is going to take place.

7              **THE COURT:**  I think at least before it was as

8    difficult to meet with clients at the D.C. jail because of

9    COVID.  The D.C. jail -- and this is in some respects more

10   recent developments -- D.C. jail is restricting video access

11   to defendants.  It's very difficult for defendants at

12   D.C. jail to prepare their cases, just generally.  That's

13   what we're hearing in various cases, and we don't have those

14   issues in Philadelphia, and counsel happens to be in

15   Philadelphia, which would make in-person meetings easier.

16             So it's not really about the defendant and being

17   here versus Philadelphia.  It's just a jail that's not the

18   D.C. jail that is not potentially overwhelmed with discovery

19   obligations and the like and a jail that happens to be

20   closer to defense counsel for purposes of in-person meetings

21   when you have Zoom restrictions.

22             **MR. HONOLD:**  Right.  I do hear all of that.  I

23   think that's something that we could address in a motion

24   that's fully briefed out and really flesh out that record of

25   what the challenges would be.  And it may be that we come

1    out the same way and maybe that the Court comes out our way.

2         **THE COURT:**  Thank you.  I'd like to hear briefly

3    from defense counsel.

4         Thank you, Counsel.

5         I'm reminded that I also have a 4:00 hearing or at

6    least a telephonic one.

7         Can you address briefly at least the question of

8    the government's evidence around the alleged tampering with

9    electronic information between January 6th and the BOLO?

10        **MS. YOUNG:**  There is no evidence, Your Honor.  I

11   understand what they're saying is there's nothing there and

12   so that makes them suspicious.  So it's not evidence of

13   anything.  They have his devices.  They have access to

14   anything on Facebook, Instagram, any other means of social

15   media to be able to subpoena those parties if they have

16   reason to believe that Mr. McKellop had any kind of accounts

17   where he was speaking or doing anything.

18        Honestly, Your Honor, I mean, I don't really know.

19   If they haven't found anything via those means, and they

20   have the video that Your Honor has seen and the images that

21   they've seen, I don't know what it is that they think that

22   they would find other than, I guess, perhaps selfies or

23   something of that nature, which doesn't add anything to this

24   argument.

25        **THE COURT:**  I think their argument is that you or

1    at least the prior counsel relied to some extent on how

2    forward-leaning Mr. McKellop was after the BOLO, and he

3    essentially cooperated, in a sense, early on.  And their

4    point is, when we look at his electronic devices, we see

5    nothing for a significant period of time, and we want you to

6    draw an inference from that, Judge Nichols.

7         I guess my question is, Do you agree with the

8    government or do you not have information to agree with them

9    that there is, in fact, what they are representing to me

10   about those devices is accurate?  We can debate about what

11   inference to draw from that but is it --

12        **MS. YOUNG:**  Have I been provided evidence of it?

13        **THE COURT:**  Yes.

14        **MS. YOUNG:**  Not to my knowledge, no.

15        **THE COURT:**  Okay.

16        **MS. YOUNG:**  Correct me if I'm wrong, did I other

17   than just telling me it?

18        **MS. DOHRMANN:**  We have told them and sent them the

19   information.  My understanding is that the -- sorry, this is

20   Mary Dohrmann on behalf of the United States.  Thank you.

21        My understanding is that the information was not

22   in a format that was accessible to them, so the FBI is

23   resending it in USB.

24        **MS. YOUNG:**  I have not seen this.  But in any

25   event, I mean, assuming it is true, I think that that

1    inference is overcome by the fact that he turned himself in.

2    He cooperated entirely in doing that.  And, again, with --

3    we're not talking about a situation where there's much of a

4    question, I don't think, with respect to the evidence that

5    they had to bring this case.

6           I just don't know what it is that they think that

7    they would have found there versus somewhere else that would

8    make any difference as to whether or not the detention -- he

9    should be detained.  The vast majority, if not all, of the

10   defendants who have pre- and post-incident speech, it's

11   happening on social media.

12          And that's where they're getting the fact that

13   people, for example, who are talking about, Let's bring guns

14   next time, was one of the cases that they cited.  I forget

15   which one, but one of the cases that they cited talked

16   about, Next time it's going to be guns.  That kind of speech

17   is coming from platforms where they have the ability to

18   subpoena that information.

19          **THE COURT:**  Right.  Right.  Anything else you'd

20   like to add?

21          **MS. YOUNG:**  No, Your Honor.

22          **THE COURT:**  Here's what I'm going to do.  As

23   Ms. Lesley has reminded me, I have a 4:00 teleconference.  I

24   had already wanted to take a recess to consider the

25   arguments that have been presented today and to decide

1    whether I want to resolve this issue orally or if I might

2    just take it under advisement and write something.  I'm

3    going to do that, and it just happens to be that I can do

4    that while I go do this teleconference, which I'm going to

5    do from chambers.

6              **MS. YOUNG:**  Okay.

7              **THE COURT:**  So we're going to go into recess.  I

8    will do that call, Ms. Lesley, from chambers, and then I

9    will let you know when I'm coming back here.  And then I'll

10   let the parties know, A, am I going to decide the question

11   today, and then, B, if I do decide the question, I will do

12   so orally.  Okay?

13             **MS. YOUNG:**  Fair enough, Your Honor.  Thank you.

14             **THE COURT:**  Thank you.

15             (Recessed at 3:55 p.m. and resumed at 4:27 p.m.)

16             **COURTROOM DEPUTY:**  We are now back on the record.

17             **THE COURT:**  So thank you, everyone, for waiting.

18             I am going to decide the motion orally today.  And

19   at least the motion to revoke the detention order and for

20   pre-trial release is denied.  And here's why, at least, in

21   summary.

22             First, I think the government is correct; that the

23   relevant standard can be found in 18 U.S. Code Section

24   3142(f)(2).  That provision deals with the reopening of a

25   detention hearing.  And, of course, to reiterate, the

Magistrate Judge here decided that Mr. McKellop should be detained.  Mr. McKellop challenged that decision in front of me.

And in April, again in an oral hearing, April 5th, 2021, I rejected that argument and held that Mr. McKellop should, in fact, be detained pending trial for the various reasons that I articulated in that hearing.

Having done so, I believe that the procedural context in which we find ourselves is that the motion should be considered a motion to reopen that determination and that hearing; and the statute -- the statute -- says the following:  The hearing may be reopened before or after determination by the judicial officer -- and we're here after the determination by the judicial officer -- at any time before trial.

If the judicial officer finds that information exists that was not known to the movement at the time of the hearing and that has a material bearing on the issue, whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person in the community.

So first, in my view, there is not and has not been proffered to me information existing that was not known to Mr. McKellop at the time of the original hearing that has a material bearing on the issue of whether there are

1    conditions of release that will reasonably assure the safety

2    of any other person in the community.

3            The principle issues that have been identified

4    relate to the time by which trial will occur here, which I

5    will discuss in a moment, relate to the conditions of the

6    D.C. jail and his ability to participate in his defense, and

7    I suppose a little bit about his current mental state.  But

8    to me, none of those issues have a material bearing on the

9    question of whether there are conditions of release that

10   will reasonably assure the safety of any other person in the

11   community.

12           So as to the standard that I have to apply here, I

13   believe it has not been met.  Even if I'm wrong about that

14   standard, that is to say, even if I have the authority to

15   review, de novo, or reconsider, de novo, my own prior

16   determination, I do not believe that a change in

17   Mr. McKellop's current condition, at least as a detained

18   defendant, is warranted.

19           To that extent, I incorporate by reference my

20   various conclusions that I will not go through again that

21   were reflected in the transcript from April 5, 2021 as to

22   why I believe that detention was warranted here.  I

23   incorporate those prior findings and conclusions by

24   reference.

25           I should note that, if anything, the new

1   information, which I really think is ultimately not all that

2   important, but all of the new information, if anything cuts

3   against Mr. McKellop just a little bit, that is the

4   government's -- I'll put it this way -- proffer as to the

5   evidence that was not discovered on his phone.  It may very

6   well be that he deleted information.  I don't really know

7   but, if anything, there might be a slight inference that one

8   might draw against him.

9          And the other is that Mr. McKellop's conduct in

10   several hearings that we've had in this matter have

11   reflected, again, not a particularly material disregard, but

12   still a disregard for these proceedings.  And, I think, at a

13   higher level of generality the rule of law which was, as

14   people know, one of the motivating factors for me, the

15   extent to which Mr. McKellop's conduct on January 6th

16   reflected a true disrespect for the rule of law.

17          So, if anything, if one were to consider the

18   current set of information, de novo, together with the

19   original set of information known to me and the movement on

20   April 5th, I would still come out the same way today that I

21   did on April 5th for the various reasons already articulated

22   by me in April.

23          That is not to say that I believe this is a

24   sustainable state of affairs.  I've expressed in this

25   hearing and a number of other hearings that continuing to

1    detain defendants when they don't have a reasonable prospect

2    of an imminent trial puts a lot of pressure on the system.

3            What's interesting in this matter is that neither

4    party is pushing for an immediate trial.  Mr. McKellop is

5    not asking to go to trial next month, and the government

6    isn't having to say, Well, we don't want to do that because

7    we have *Brady* obligations.  Both parties seem to be in

8    agreement that a lot needs to happen between now and when

9    that trial occurs.

10            Then, of course, the only question is, at least as

11   between now and then, does Mr. McKellop remain detained or

12   is he going to be, perhaps, on home detention with his

13   professor relative, who is here and whose presence I credit.

14   And I thank him for being here.  But I still don't think

15   that these circumstances about the pending discovery and

16   delay in this case, so to speak, warrant his release.

17            It may very well be that it is appropriate to have

18   Mr. McKellop, at least in the first instance, move to

19   Philadelphia so that he, at a minimum, can participate in a

20   more fulsome manner in his own defense.  I don't presently

21   have in front of me a motion seeking that relief.

22            It is my understanding that that can be a

23   complicated, maybe even a more complicated question than one

24   might imagine.  But I am not deciding today that I would not

25   grant that motion.  That's two double negatives -- or that's

1     a double negative.

2            I do not have that motion in front of me, and I am

3     not denying it as a result.  I am open to such a motion,

4     should it be brought.  And the government, as counsel

5     indicated, would then take a position on it.  It might

6     oppose it.  It might agree with it, but I will take it up

7     then.

8            But for present purposes, I do not believe that

9     Mr. McKellop has demonstrated that he should, in light of

10    the current evidence and all of the other arguments that

11    I've considered, that he should be released pre-trial.  And,

12    again, if he decides he wants to ask to move to

13    Philadelphia, I will consider that motion in due course.

14           I guess what I would say in closing is -- and

15    again I've said this several times here.  I've said it

16    several times in other matters.  I hope that the government,

17    in particular DOJ, is doing everything they can, and I have

18    every reason to believe they are, but I hope they recognize

19    that at least some of the judges on this bench are getting

20    concerned about the, again, the tension or at least the

21    pressure that's being placed on the system when we have

22    detained defendants where we can't even begin to set trial

23    dates.

24           I recognize that this case is a unbelievably

25    unique set of circumstances, unbelievably unique set of

1    information and volume of information.  I am certainly not

2    suggesting that this is a run-of-the-mill case.  But I am

3    starting to become even more concerned about something like

4    indefinite detention when we can't even begin to start

5    talking about trial dates.

6           So to that end, I want to make sure that we at

7    least continue to be back in status conferences as soon as

8    possible so that this case doesn't go from its current

9    status to true languishing.  And so I hope that today we can

10   at least set the next status.

11          I recognize that Mr. McKellop and counsel will be

12   unhappy with my decision, but nevertheless, I hope we can

13   look at our calendars.  And what I would propose is another

14   status in this matter before Thanksgiving, so either

15   November 22nd, 23rd or 24th by phone.  I will just propose

16   November 23rd at 2:00 p.m.  Does that work for the

17   government?

18          **MR. HONOLD:**  Yes, Your Honor.  Thank you.

19          **THE COURT:**  So what we'll do is we'll set another

20   status in this matter for November 23rd at 2:00 p.m.  I

21   guess we'll presumptively make it by phone but, as always --

22   obviously, if there is some other form of relief being

23   sought, we can take that up.  But as always, should anyone

24   want to do this by video or in person, we can try to make

25   that work.  Video is complicated because we have to work

1    with the schedule.  But if Mr. McKellop would like to do

2    that hearing in person, I am open to it.  I recognize

3    counsel is in Philadelphia.

4            So are there any questions about either that or

5    other things I've said this afternoon?

6            **MS. YOUNG:**  No, Your Honor.

7            **THE COURT:**  Thank you.

8            **MR. HONOLD:**  No, Your Honor.  No questions.

9            **THE COURT:**  Okay.  Thank you, Counsel.

10           Government has moved to exclude time under the

11   Speedy Trial Act.  I'll just assume it's to permit the

12   continuing discovery productions and then presumably review

13   by defense counsel and also, what we haven't really

14   discussed today but I understood from the papers at least

15   is, to facilitate defendant's continued consideration of the

16   plea offer.

17           Counsel, does Mr. McKellop consent to exclusion of

18   the Speedy Trial Act time?

19           **MS. YOUNG:**  Based on my conversation with him, no,

20   Your Honor.

21           **THE COURT:**  So the defendant does not consent to

22   exclusion of the Speedy Trial Act time, though defendant is

23   not pushing for an immediate trial.  I nevertheless conclude

24   that, at least for the present period, as between today's

25   date and the next status of November 23rd, that it is

47

1    appropriate to exclude time under the Speedy Trial Act

2    because of the continuing discovery because of the pending

3    nature of the, what I understand, is a plea offer, that it's

4    in the interest of justice to exclude that time and it is so

5    excluded.  Thank you for that.

6              Any other topics?

7              **MR. HONOLD:**  No, Your Honor.

8              **THE COURT:**  Okay.  Thank you, Counsel.

9              (Proceedings concluded at 4:39 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **C E R T I F I C A T E**

2

3              I, **Lorraine T. Herman, Official Court**

4       **Reporter,** certify that the foregoing is a true and

5       correct transcript of the record of proceedings in the

6       above-entitled matter.

7

8              **Please Note:**  This hearing occurred during

9       the COVID-19 pandemic and is therefore subject to the

10      technological limitations of court reporting remotely.

11

12

13

14      __**May 12, 2022**___               ___/s/_____
                **DATE**                          **Lorraine T. Herman**

15

16

17

18

19

20

21

22

23

24

25