## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

                                      CR Action
                                      No. 1:21-268

     vs.                            Washington, DC
                                      May 3, 2022
JEFFREY MCKELLOP,

                                      12:35 p.m.
             Defendant.
_____/

TRANSCRIPT OF IN-PERSON MOTION HEARING
BEFORE THE HONORABLE CARL J. NICHOLS
UNITED STATES DISTRICT JUDGE

APPEARANCES:

**For the Plaintiff:**     **MARY DOHRMANN**
                              **MARIA FEDOR**
                              U.S. ATTY'S OFC FOR D.C.
                              555 4th St, NW
                              Washington, DC 20530
                              202-252-7035

**For the Defendant:**    **JOHN KIYONAGA**
                              JOHN C. KIYONAGA LAW OFFICE
                              600 Cameron Street
                              Alexandria, VA 22314
                              703-739-0009

**Reported By:**         **LORRAINE T. HERMAN, RPR, CRC**
                              Official Court Reporter
                              U.S. District & Bankruptcy Courts
                              333 Constitution Avenue, NW
                              Room 6720
                              Washington, DC 20001
                              202-354-3196

*** Proceedings recorded by stenotype shorthand and this
    transcript was produced by computer-aided
    transcription.

1              **P R O C E E D I N G S**

2              **DEPUTY CLERK:**  Good afternoon, Your Honor, this is

3    criminal case year 2021-268, United States of America versus

4    Jeffrey McKellop.

5              Counsel, please come forward and introduce

6    yourselves for the record, beginning with the government.

7              **MS. DOHRMANN:**  Good afternoon, Your Honor.  Mary

8    Dohrmann on behalf -- oh, sorry.

9              **THE COURT:**  Well, I should say -- I apologize --

10   the way I conduct hearings in court is, I'm not masked.

11   Whoever is at the podium, I would ask you to take off your

12   mask, assuming you are comfortable with that.  It's better

13   for court reporter, courtroom deputy, me, opposing and just

14   put your mask back on at counsel table.

15             **MS. DOHRMANN:**  I understand, Your Honor.

16             Mary Dohrmann, on behalf of the United States.

17   And also with me is Maria Fedor, on behalf of the United

18   States.

19             **THE COURT:**  Counsel.

20             **MR. KIYONAGA:**  Good afternoon, Your Honor.  John

21   Kiyonaga on behalf of Mr. McKellop, who is present.

22             Your Honor, I am very sorry.  If the Court wishes

23   to fine me for the inconvenience to the Court and to the

24   government, I am not going to object.  I could offer an

25   explanation, because I had one, but it is not an excuse.  I

1    am just very sorry I wasn't here.

2              **THE COURT:**  I appreciate that.  I don't think a

3    fine is necessary.  We are ready to proceed, assuming you

4    are prepared to argue today.

5              **MR. KIYONAGA:**  I am, Your Honor.

6              **THE COURT:**  Then I would like to roll right into

7    the hearing itself.  Obviously, there are a number of

8    motions pending before me.  I would like to hear argument on

9    all of them.  We have cross-motions, in a sense.  I think

10   I'd like to start with the government, hear from the

11   government on all of the motions, and then I will hear from

12   you, Mr. Kiyonaga, on all of the motions, hear from the

13   government on all of the motions, if there needs to be a

14   rebuttal or surrebuttal, I will hear from you.

15             My guess is I may resolve some of them today and

16   others I may take under advisement, but we can just get to

17   it.

18             **MR. KIYONAGA:**  Very well, sir.

19             **THE COURT:**  Thank you.

20             **MR. KIYONAGA:**  Thank you.

21             **THE COURT:**  Ms. Dohrmann, will you be taking the

22   lead?

23             **MS. DOHRMANN:**  Yes, Your Honor.  I will be

24   handling the character evidence motion, the U.S. Secret

25   Service motion and the venue motion.  And Ms. Fedor will be

1    handling self-defense and selective prosecution.

2            **THE COURT:**  Why don't we start with you then,

3    Ms. Dohrmann.

4            **MS. DOHRMANN:**  Certainly.

5            **THE COURT:**  And as I said, I would like to hear

6    from you about all three.  I know some are your motions,

7    some are not.

8            **MS. DOHRMANN:**  Thank you, Your Honor.

9            **THE COURT:**  You can take your mask off -- I'm so

10   sorry.  I'm still adjusting to generally when to have it on

11   and when to have it off.

12           **MS. DOHRMANN:**  Your Honor, with respect to the

13   government's motion regarding character evidence, based on

14   the pleadings and conversations with defense counsel, there

15   is no disagreement generally on the applicable law.  And the

16   fact that the specific commendations, et cetera, that have

17   previously been cited to this Court by the defendant would

18   not be admissible.

19           The defense's argument is essentially that the

20   government's motion is unnecessary.  And the government

21   would submit that it is not.  The rule requires that

22   character evidence, if any, relate to a pertinent character

23   trait, in which case reputation evidence would be

24   admissible.

25           We are asking the Court to find that general

1    character that could be potentially extrapolated for

2    military service, such as commitment to public service,

3    bravery, et cetera, is not a pertinent character trait that

4    could even be admitted through reputation evidence.

5            As, I think, our motion makes clear, we are not

6    disputing that law-abidingness generally may always be a

7    pertinent character trait, but the government's position

8    would be that his military service commendations, et cetera,

9    would not be relevant.

10           **THE COURT:**  So the order I enter says what?

11   Character evidence is excluded to the extent that it's not

12   admissible?

13           **MS. DOHRMANN:**  No, Your Honor --

14           **THE COURT:**  It's not just a statement of the rule?

15           **MS. DOHRMANN:**  Your Honor, I think what the order

16   the government would request would state would be, first --

17   and perhaps this is the simpler exception to the rule --

18   first, that the defendant's specific acts within the context

19   of his military service do not go to an essential element of

20   the offense, and therefore are not admissible under -- I

21   believe it is Rule 405(b).

22           And, second, that the only pertinent character

23   trait that potentially would involve any mention of his

24   military service would relate to law-abidingness; and that

25   is to say that other character traits to be potentially

1    derived from military service such as commitment to public

2    service, bravery, et cetera, are not pertinent.

3            **THE COURT:**  Okay.

4            Why should I do this order now rather than waiting

5    for individualized questions to arise at trial --

6            **MS. DOHRMANN:**  Your Honor --

7            **THE COURT:**  -- since it sounds pretty close to

8    just a statement of what the law is?

9            **MS. DOHRMANN:**  Understood, Your Honor.

10           The government's hope is to expedite this trial

11   and, of course, to save jury resources, government's

12   resources, court resources.  And we are aware, too, that of

13   course given the volume of trials in this Court at this

14   time, we do not want to waste valuable trial time at sidebar

15   or with the jury out of our presence to address what we

16   believe should be quite -- we agree they are straightforward

17   issues, Your Honor.  And that is why we would like to

18   streamline and address them ahead of time.

19           **THE COURT:**  Okay.

20           How about your next -- either your motion or the

21   opposition?  I'm happy to hear the other two in whatever

22   order you'd like.

23           **MS. DOHRMANN:**  Sure, Your Honor.  I think we can

24   address the United States Secret Service first.  Briefly, as

25   a sense there is a similar sort of approach in the

1    defendant's opposition.  Again, there is really not a

2    disagreement on the government's legal reasoning and its

3    motion, but there is this request from the defense for

4    latitude.  And quite frankly, Your Honor, the government is

5    puzzling a little bit over this single line saying, you

6    know, protocols related to shots fired and SWAT, how that

7    could possibly be relevant to this case.

8              The whole point of the government filing its

9    motion is that the United States Secret Service and its

10   protocols are sensitive information.  Latitude is exactly

11   what is a threat here to presenting potentially irrelevant

12   and also prejudicial, in a very broad sense, to the Secret

13   Service information.

14             **THE COURT:**  Yes.  On that one, Mr. Kiyonaga, I'm

15   going to want to hear from you exactly what you have in mind

16   by that statement.

17             **MR. KIYONAGA:**  Very well, Your Honor.

18             **MS. DOHRMANN:**  Your Honor, I can turn to the venue

19   opposition now.

20             **THE COURT:**  Yes, please.

21             **MS. DOHRMANN:**  Your Honor, voir dire is the

22   mechanism in place to address any of the, you know, myriad,

23   sort of somewhat speculative, or even if not, concerns

24   raised by the defendant; that is what voir dire is for.

25             Your Honor, the proof is in the pudding with this,

1    which is that so far -- I believe I am counting correctly --

2    that four different judges have conducted voir dire in four

3    different cases stemming from the events of January 6th,

4    2021.  They have been able to do so in -- not only a

5    reasonable amount of time but without, as far as I

6    understand, having even to call in numerous extra venires or

7    anything of that nature.  This has been done in this

8    courthouse successfully.

9            Your Honor, I think there's two main weaknesses in

10   the defendant's motion that the government would like to

11   draw the Court's attention to.

12           The first is, in general, there is some data cited

13   to support the defendant's motion.  There is some.  But what

14   there isn't is data to support the move to the district that

15   the defendant is requesting and any suggestion that it would

16   in any tangible way, that there are differences in that

17   district.

18           And the government would note -- and this relates

19   to the second point -- the Western District of Virginia,

20   like every district in America, also receives national news

21   coverage.  In fact, several of the recent articles cited by

22   the defense in its reply are actually articles from the

23   Western District of Virginia, from Fishersville and other

24   cities in that area.

25           Your Honor, those are the main points that the

1    government wished to make on the venue motion.

2            **THE COURT:**  Does the government agree that if, for

3    whatever reason we get to voir dire and it turns out that we

4    actually have a very hard time picking a jury in this case,

5    that at that point it would be appropriate for me to

6    consider transferring?

7            **MS. DOHRMANN:**  Your Honor, I think that -- I

8    imagine that the government and the defense would have a

9    very different -- possibly a different view of what

10   constitutes a very hard time.

11           **THE COURT:**  I agree.  But at that point we would

12   have -- at least from the government's perspective, at least

13   we would have more information about what the venire looks

14   like as it relates to this case.

15           **MS. DOHRMANN:**  That's right, Your Honor.  And

16   that's why the government believes that is the

17   well-established avenue to selecting a fair and impartial

18   jury here.  And it is at best premature to consider the

19   defendant's motion in this case.  Although, as we stated

20   earlier, we would submit that the evidence is mounting that

21   there will not be a --

22           **THE COURT:**  I'm well aware that -- it seems to me

23   that juries have been picked in this courthouse; that my

24   understanding of the data is not the right way to put it

25   because it's not scientific.  I don't think there's been any

1    comprehensive survey.  But my understanding is a substantial

2    number of the venire who have showed up for service have

3    been qualified.

4         Now, I don't know what exact questions were asked

5    of them and what the objections were, but at a minimum we've

6    had four juries that have been picked without calling extra

7    jurors as you've suggested.

8         But it seems to me that that does not necessarily

9    mean that in this case we will have the same success.  And

10   so my question is, at least from the government's

11   perspective, is it theoretically possible that if we don't

12   -- that is to say if we have a very difficult time

13   qualifying a jury here, that at that time I could reconsider

14   -- assuming I don't grant it now -- the venue motion?

15        **MS. DOHRMANN:**  Your Honor, I think that we would

16   have to concede that; of course it is possible that that

17   situation would arise.  The government would submit that

18   denial of the motion is nevertheless appropriate at this

19   time on the present record in this case.

20        And I do just want to note one thing that I think

21   is really important about the venue issue, which is that the

22   constitution provides that venue shall be in the state where

23   the offense was committed.  This is not a controversial

24   choice of venue to begin with.  This is constitutionally

25   based.

1        **THE COURT:**  Thank you.  Yes.

2              Anything else on that motion?

3        **MS. DOHRMANN:**  No, Your Honor.

4        **THE COURT:**  Okay.  Thank you.

5        **MS. DOHRMANN:**  Thank you.

6        **THE COURT:**  Mr. Kiyonaga, I want to hear from the

7   government on the other two motions.  So we will hear from

8   the government on all five and then hear from you on five.

9   They've split it up.

10       **MR. KIYONAGA:**  Very good.

11       **MS. FEDOR:**  Good afternoon, Your Honor.

12             I will first address the self-defense Motion in

13  Limine.  As the government has put forth in our papers and

14  motions to Court, the defendant should be precluded from

15  putting forth a defense of self-defense because the

16  defendant was the initial aggressor.  When one is the

17  initial aggressor, he is therefore not -- an affirmative

18  defense of self-defense is not an available to him at that

19  time.

20             Also, more importantly is that when the defendant

21  did arrive on scene, if in any circumstance it would be

22  deemed there was excessive force by the officer, which the

23  government would submit was not the case here, as the

24  defendant was illegally on those grounds and violating

25  federal law.  And the officers at that time had the ability

1   to put forth lawful force on the defendant to effectuate an

2   arrest at that time, if they so see the need for it.  And I

3   would cite to *Oberwetter vs. Hillard*, 639 F.3d 545.  It's a

4   D.C. Circuit Court decision from 2011.

5          Your Honor, as I indicated, the defendant was not

6   the initial aggressor.  But assuming that he was the initial

7   aggressor -- which as the government has said, there is no

8   evidence to indicate that that was the case, that he was not

9   the initial aggressor -- he was -- therefore -- still show

10   he was objectively reasonable in the use of his force and

11   that it was not greater than --

12          **THE COURT:**  Can I just pause you for a second?

13          **MS. FEDOR:**  Uh-huh.

14          **THE COURT:**  Mr. McKellop says, I don't yet have an

15   obligation to tell you one way or the other whether I am

16   going to assert a self-defense defense.  It's premature.  So

17   he hasn't even responded to any argument about whether one

18   is available.  He hasn't purported to make a proffer.  And

19   he's saying, I don't need yet to make a proffer.

20          What's the government's argument for why he's

21   obligated to disclose now the fact that he intends to make a

22   he self-defense argument and any proffer in support of it?

23          **MS. FEDOR:**  Yes, Your Honor.

24          So at this juncture the people -- the government

25   put forth this motion because we are following the Court's

1      motions schedule in the scheduling order, and this is the

2      motion that we had put forth as a Motion in Limine.  Courts

3      have routinely dealt with this issue with proffer of

4      evidence prior to being heard by the jury, outside of the

5      presence of the jury.

6              The government has cited -- will reiterate at that

7      time -- *U.S. v. Bailey*, 444 U.S. 394; U.S. v. -- I'll spell

8      this out -- L-e-b-r-e-a-u-l-t, dash, F-e-l-i-z -- 807 F.3d

9      1, First Circuit Court decision 2015; U.S./Portillo-Vega,

10     478 F.3d 1194, Tenth Circuit case, 2007.

11             Your Honor, this issue is routinely dealt with

12     before the Court prior to being heard by the jury.  The

13     issue is we don't want the jury to be tainted by a defense

14     that is not a viable defense, not legally authorized at this

15     point.

16             Whether or not this becomes an issue with charging

17     instructions at that time, Your Honor, I think at that point

18     it could be revisited whether or not the defense could be

19     given.  But with regards to putting the evidence and

20     arguments before a jury, at this juncture, Your Honor, there

21     is no basis as a matter of law for that to be given to the

22     defense -- to the jury.

23             **THE COURT:**  Do you disagree with how Judge Mehta

24     handled this question in the recent trial that came back

25     with a verdict yesterday, where self-defense was put at

1    issue?

2              Judge Mehta basically denied the government's

3    Motion in Limine, as I understand it, to exclude earlier

4    than the trial any evidence around self-defense.  I must

5    admit, I don't know whether and to what extent there was a

6    proffer outside of the presence of the jury, but certainly

7    Judge Mehta declined to decline the government's Motion in

8    Limine in that case in a pretrial posture.  Do you think

9    that was wrong?

10             **MS. FEDOR:**  Your Honor, I would have to say that

11   with the facts of this case and the evidence that we have in

12   this case, that there is no basis to deny the motion at this

13   time, the government's Motions in Limine.

14             We put forth in our motion papers, not only the

15   facts that are encompassed by the current indictment, but

16   also facts that we hope to anticipate superseding with,

17   where the defendant starts his aggressive acts and

18   assaultive behavior, starting about 1:02 p.m., Your Honor.

19   That is the time we are going to argue that the defendant

20   has --

21             **THE COURT:**  Right.

22             Normally, what would happen, you make that

23   argument and the defendant says, no.  No.  No -- I assume we

24   are closer to trial -- I do want to put on a self-defense

25   defense.  Here is my proffer.  I would intend to say X, Y

1    and Z.  Tells us that outside of the presence of the jury,

2    and I assess whether he has got enough to be presented to

3    the jury.

4            That is -- I don't know that there is a rule that

5    requires that to happen at the time of trial or as early as

6    now.  I take it the government's argument is, the reason I

7    should resolve it now is because there's a pretrial motion

8    schedule and the Motion in Limine is the place to do it.

9            Why can't I just -- or what's wrong with my either

10   reserving the Motion in Limine or denying it without

11   prejudice to taking it up again when we get closer to trial?

12   Assuming I am persuaded by Mr. Kiyonaga's argument that he

13   doesn't have to disclose that yet and that this is typically

14   dealt with closer to trial?

15        **MS. FEDOR:**  Well, Your Honor, the government's

16   position would be that so long as it is happening -- the

17   decision is made prior to the jury's hearing it, before they

18   get tainted, before we can unring that bell before them.

19           So the government has filed this motion because we

20   are trying to abide by the Court's schedule and the Court's

21   orders for the motions schedule.

22        **THE COURT:**  Yes.  Understood.

23        **MS. FEDOR:**  Yes.  And at this time without having

24   any indication or evidence or arguments or proffer of facts

25   to show otherwise, at this juncture, the motion should be

1    granted.  If it is then later raised by the defendant at the

2    time of trial, closer to trial, then at that time it would

3    be appropriate to revisit it.  But in the absence of that,

4    in a vacuum, right now, with the facts that we have, the

5    defendant has no basis to argue this motion should not be

6    granted.

7              **THE COURT:**  Fair enough.  Thank you.

8              **MS. FEDOR:**  Yes.

9              **THE COURT:**  And then selective prosecution.

10             **MS. FEDOR:**  Yes, Your Honor.

11             With regard to selective prosecution, this issue

12   has actually been dealt with before Your Honor and it's also

13   been dealt with before Judge McFadden in *U.S.v. Judd*.  The

14   citation is 21-CR-40.

15             What happened on January 6th at the U.S. Capitol

16   is something totally different than what happened in the

17   Portland protests, Your Honor.  And as Your Honor noted, it

18   has to be a similar situated group of individuals and the

19   kind and degree.

20             As Judge McFadden noted, there must be no

21   distinguishable, legitimate, prosecutorial factors that

22   might justify different prosecutorial decisions between the

23   groups.

24             The defendant, as defense counsel has noted in his

25   response -- or his reply -- is that he did not enter the

1    building.  That is taking one pinpoint factor in all of what

2    happened on January 6th on the grounds of the Capitol.  You

3    have to look at the situated individuals in both scenarios.

4           In Portland it was occurring at night in an empty

5    federal court building and no one entered.  In D.C. it is a

6    constitutionally, statutorily-mandated process that was

7    happening.  There was a riot occurring.  And riots are not a

8    riot but for the mob of people that are part of it.

9           The defendant himself assaulted multiple officers,

10   allowing other individuals to then gain access to the

11   Capitol, and to feel emboldened enough to enter the Capitol,

12   roam the halls, as individuals within that building who were

13   there just merely to work and was guaranteed by the

14   constitution for them to do, hovering in hallways and

15   conference rooms.

16          This is a totally different scenario than what

17   happened in Portland.  And it is not under any sort of guise

18   and argument, and colorable argument can be made that they

19   are similarly situated.  They are absolutely not similarly

20   situated.

21          And without even meeting that prong of his

22   requirement, he's also then, with regards to discriminatory

23   purpose, put forth no evidence to indicate that there was

24   any discriminatory purpose in the prosecution of defendant

25   McKellop versus anybody in Portland.

1          He is merely -- (indiscernible) -- a personal

2    conclusion and argument without any evidence or facts or

3    anything else to support it, aside from the fact that he was

4    charged and people in Portland were not or that they were

5    dismissed.

6          So, Your Honor, the government's position is that

7    his Motion to Dismiss for selective prosecution should also

8    be denied.

9          **THE COURT:**  Thank you, Counsel.

10          **MS. FEDOR:**  Thank you, Your Honor.

11          **THE COURT:**  Mr. Kiyonaga, so let's take up all

12    five of those motions.  Obviously, some are the government's

13    and some are yours.

14          Why don't we start with the government's motions,

15    just to make it organizationally easy.  And I want to

16    understand your position on each of them, just so I have it

17    right.  Let's talk first about the self-defense motion.  The

18    Motion in Limine to Exclude Self-defense Defense.

19          **MR. KIYONAGA:**  Your Honor, the government is

20    relying in its argument on supposed facts that have yet to

21    be proven.  We haven't had a trial yet.  We don't even have

22    complete discovery.  To say that Mr. McKellop was the

23    initial aggressor is unsubstantiated and grossly premature.

24          I think one thing everybody can agree upon is that

25    the events of that day were chaotic, totally confusing.

1    Very, very hard to determine who did what, when, how and

2    why.  That's part of the reason why the discovery in this

3    case is taking so unprecedently long to gather and to review

4    and to disclose.

5            So to say at this juncture, before a shred of

6    evidence has been presented, that he was an initial

7    aggressor or that he was illegally on the grounds is simply

8    not supported by what stands before the Court right now.

9            **THE COURT:**  Do you agree with the government that

10   at some point you will need to make a proffer outside the

11   presence of the jury about a self-defense defense, if you

12   wish to make a defense?

13           **MR. KIYONAGA:**  I do not, Your Honor.

14           **THE COURT:**  Okay.

15           **MR. KIYONAGA:**  First of all, as far as I can tell,

16   it's nowhere required by any rule.  It was not the case in

17   the *Bailey* and the *Lebreault* cases.

18           The trial is the best place to weigh the relevance

19   and admissibility of specific items of evidence; that's why

20   we have rules of law, that's why we have the protocols of

21   trial that call for direct examination and cross-examination

22   and the opportunity to object and argue the objections

23   outside of the hearing of the jury, if that's called for.

24           It's only under those circumstances that the Court

25   is able appropriately and adequately to appreciate the

relative value or pertinence of the evidence that's being

propounded at that moment.  To try to do so ahead of time

simply limits the defense in terms of what it can -- what it

can present or seek to adduce during the course of the

trial.

The trial is supposed to be a dynamic process.

It's a search for the truth.  The burden for proof lies

exclusively on the government.  Obviously an affirmative

defense is -- the initial burden switches to the defendant,

but it's a process that is meant to be dynamic.  And the

reason Article III judges are appointed and confirmed is

because the constitution relies on people like Your Honor to

use your God-given discretion and common sense to make the

right call in the course of the trial.

Moreover, the government just is not entitled to a

roadmap of the defense ahead of trial.  I have no idea what

the defense is going to be.  We are still wrestling with the

discovery.  And typically I don't have an ironclad sense of

what the defense is going to be until the government has

finished its presentment of evidence.

So to try to hornswoggle all of this now into some

neat little cubbyhole that the government is requesting

simply is not called for.

**THE COURT:**  Okay.  How about the Secret Service

motion?  What you say in your brief is -- and this is what I

1    wanted to ask you about because I don't really understand

2    it -- Mr. McKellop does seek latitude to cross-examination

3    as to the protocols in place to address specific exigencies,

4    e.g., shots fired, calling for deployment of SWAT.  Why

5    would that be relevant here?

6                **MR. KIYONAGA:**  Your Honor, I did not -- I could

7    have been more artful in my choice of words.  I don't -- to

8    my knowledge no shots were fired.  So that is not relevant.

9                I was simply trying -- and I should have given it

10   more thought -- to formulate an example of a scenario that

11   would call for a specific response or specific measures by

12   the Secret Service.  The defendant has no wish to transgress

13   security protocols.  We don't want to make a matter of

14   public record what the Secret Service does or proposes to do

15   under given circumstances.

16               But if the trial proceeds in such a way that the

17   conduct of the Secret Service does not conform to the level

18   of threat being alleged by the government, then I would

19   submit that the defense should be able to explore the

20   specific protocols that are supposed to govern the Secret

21   Service conduct.

22               I have no idea what they are.  I would imagine

23   that there is specific directives in place, in the event

24   that there is a reasonable perception of a physical threat

25   to somebody like the Vice President.  And what I'm seeking

1    is the latitude to explore that if and when the evidence

2    produced on direct opens the proverbial door for me to do

3    so.

4           I should add parenthetically, Your Honor, the

5    Court instructed counsel for both parties to talk about the

6    motions and we did, in fact, talk.  And I made a specific

7    suggestion, in an effort to reach a compromise on this

8    motion, but it was not accepted, as well as I think on the

9    self-defense motion.

10    **THE COURT:**  Your basic point here is, I don't know

11    what's going to come in on direct.  It's possible something

12    as to the Secret Service will be relevant.  So I don't want

13    to be foreclosed altogether from being able to ask

14    questions.  And you, Judge Nichols, are in a position to

15    police the appropriateness of the questions and any security

16    issues that the Secret Service might have.

17    **MR. KIYONAGA:**  Your Honor captured it much more

18    clearly than I did.  Yes, sir.

19    **THE COURT:**  Okay.  All right.

20           How about the third Motion in Limine, the

21    character evidence?

22    **MR. KIYONAGA:**  Your Honor, I think I can almost

23    stand on the pleadings on that.  But I do believe -- I mean,

24    the Court hit the issue when it asked the government if it

25    was not simply asking for an order to confirm the Rule of

1      Evidence -- I'm sorry, Your Honor, I've got a --

2               The best opportunity and the best method of

3      policing the evidence to go before the jury, direct,

4      cross-examination, objections, arguments on objections are

5      the most dynamic and the most accurate way of evaluating the

6      pertinence and relevance of the evidence.

7               To say at the outset that character evidence could

8      not be relevant is, again, very premature.  The government

9      mentioned bravery and commitment to duty as character traits

10     that are personified by soldiers.  I was in for five years,

11     Your Honor.  I am not sure I agree with that.  But certainly

12     most soldiers are brave and very committed to duty.

13              The Army or any military service is a much bigger,

14     more complicated, far more subtle creature.  There are all

15     sorts of things that go into a serving member of the

16     military, patience, loyalty, humor, all sorts.  Without even

17     having complete discovery, without having heard a shred of

18     the evidence to be presented, it's impossible at this

19     juncture to say what traits that Mr. McKellop may or may not

20     have demonstrated earlier in life, particularly during his

21     service, will be relevant and properly to be admitted before

22     the jury.

23              Again, my sense is that the government is very

24     properly responding to the scheduling order, but that the

25     practical affect of the relief that they seek is very

24

1   impractical; and that the trial itself will leave the Court

2   more than ample opportunity to make sure that the jury is

3   not being confused or unduly prejudiced by anything that

4   comes in.

5           **THE COURT:**  Fair enough.

6           How about the venue motion?

7           **MR. KIYONAGA:**  Your Honor, the venue motion -- if

8   the Court would bear with me one second.

9           First of all, Your Honor, voir dire cannot cure

10  all ills.  I don't know whether the Court conducts its own

11  voir dire or allows counsel to conduct it.  But the case law

12  is full of cases where jurors who should have been stricken

13  on voir dire for cause somehow or other made their way on to

14  the jury and then created a verdict that was incorrect,

15  impermissible, unconstitutional, whatever the case may be.

16          The salient fact is that 93 percent of Washington,

17  D.C. voters voted for President Biden.  This is an

18  almost-uniquely Democrat venue.  I think it would be

19  self-evident that Washington, D.C. is materially different

20  from the Western District of Virginia.  The Western District

21  of Virginia is primarily agriculture, far more racially,

22  ethnically and in terms of livelihood diverse as a district

23  as where Mr. McKellop lived until he was arrested and

24  confined.

25          But most importantly, D.C. is uniquely aggrieved

1    by the events of January 6th.  The residents of D.C. live

2    here.  The constitution does indicate a preference for venue

3    in the situs of the offense, but the whole country was

4    offended, was aggrieved by January 6th.  So certainly the

5    residents of Roanoke, Virginia are equally as aggrieved,

6    except the residents of Washington were aggrieved in a more

7    personalized and a more tangible way.

8          We had the National Guard on the streets for, I

9    can't remember how long.  I didn't come into town.  I live

10   two blocks outside of town in Maryland, and I didn't come

11   into town for months after January the 6th, because I didn't

12   want to deal with the turmoil and the security on the

13   streets.

14         There's no question that residents of D.C. felt

15   personally aggrieved by the events of the day.  They were

16   traumatic, because they were happening literally in their

17   backyard.

18         **THE COURT:**  Couldn't everything you just said have

19   been said equally about, for example, the Boston Marathon

20   bomber?

21         **MR. KIYONAGA:**  Your Honor, that is correct.  But

22   the fact is that D.C. is -- D.C. sued the organizers of the

23   January 6th rally and the D.C. Attorney General, Karl

24   Racine, stated that D.C. residents are particularly

25   aggrieved.  They are particularly traumatized by the events

1    of the day.  Sufficiently so to justify a federal lawsuit.

2              There is no -- I mean, the events of the Boston

3    bombing horrified the whole country and were particularly

4    horrifying, I would suppose, to residents of Boston.  But

5    they weren't followed by -- I think it was nearly four

6    months of National Guard presence on the street, of snow or

7    blizzard fences all over the Capitol, closing off what used

8    to be virtually open public space.

9              The residents of D.C. had a uniquely-tangible,

10   uniquely-immediate and a uniquely-personal view to what

11   happened and a continuing reminder of it for a matter of

12   months.  And that's not true, to my knowledge, in the case

13   of any other high-profile case that is included --

14             **THE COURT:**  But why aren't all these topics and

15   the effects of January 6th on the residents of the district,

16   how they feel about it, and the like, why isn't that best

17   explored through individualized voir dire to see whether and

18   to what extent individual potential jurors can,

19   notwithstanding what you just said, be qualified?  Is it

20   your view that one literally could not find 14 unbiased

21   jurors in the District of Columbia?

22             **MR. KIYONAGA:**  Your Honor, they say, Never say

23   never.  But I would submit that the likelihood of

24   accomplishing that would be extremely low given --

25             **THE COURT:**  And so what's your response to the

1    fact that four of my colleagues have apparently done so?

2         **MR. KIYONAGA:**  Your Honor, they all had their

3    reasons, but this Court obviously does not feel itself

4    constrained to follow its colleagues.  And I celebrate that

5    fact.

6         So I'm submitting to the Court, to this Court,

7    that this particular jury pool minimizes to such a vast

8    extent the opportunity to identify 14, honestly-impartial

9    juries, that the ends of justice and the search for truth

10   are best met by pursuing -- by undertaking the trial

11   elsewhere.

12        **THE COURT:**  Okay.  And how about the last

13   question, the selective prosecution motion?

14        **MR. KIYONAGA:**  Your Honor, "different" is an

15   extremely elastic term.  A selective prosecution motion in

16   order to prevail has to show a discriminatory effect and a

17   discriminatory motive.  And, of course, the motive can be

18   inferred from the evidence.

19        I would submit that the riots in Portland, and

20   other places to include in front of the White House, but

21   particularly important in Portland, for purposes of this

22   motion, are sufficiently similar in the important aspects

23   that bind them --

24        **THE COURT:**  Do you have any examples of persons in

25   Portland who engaged in conduct of the kind Mr. McKellop is

1    alleged to have engaged in who were not charged?

2         **MR. KIYONAGA:**   I cited them in the reply, Your

3    Honor.   There were at least two defendants who were accused

4    with physically assaulting officers, head lock, throwing

5    them to the ground, that sort of thing.   And they were both

6    -- both of their charges were dismissed with prejudice.

7         So the fact that one was on the west coast and one

8    was here.   The fact that one involved a courthouse as

9    opposed to the Capitol building, I would submit for the

10   purposes of this argument that those are distinctions

11   without a difference.

12        Attacking federal law enforcement, physically

13   closing, and throwing them to the ground by grabbing them

14   around the throat is certainly -- has commonality in terms

15   of the sort of conduct alleged, in terms of the conduct.

16        To say that a court -- there was no vote count

17   going on in the court at the time, a U.S. District Court is

18   the quintessence of federal authority.   Every brick in the

19   place is official.   And to attack the court is to attack its

20   function, its purpose.   That commonality, with the

21   allegations of January 6th, render the two events

22   sufficiently similar to support the motion.

23        **THE COURT:**   Thank you, Mr. Kiyonaga.

24        I'll hear from the government very briefly, if

25   you'd like to add anything.   I think I have it all, but if

1      there's anything you feel particularly warrants --

2              **MS. DOHRMANN:**  Your Honor, unless you have any

3      specific questions, I do not think we have a need to respond

4      at this time.

5              **THE COURT:**  I don't.  Thank you.

6              **MS. DOHRMANN:**  Thank you, Your Honor.

7              **THE COURT:**  So before I address one other

8      question, I suppose, which is not about the pending motions,

9      and that is about the schedule in the case.  Are we still on

10     track to try this case in July, Mr. Kiyonaga?

11             **MR. KIYONAGA:**  Your Honor, we are at the moment.

12     But -- we are still getting our arms around the discovery.

13     I had about a two-month period where I was basically combat

14     ineffective.  I was in the hospital three times.  I'm fine

15     now.

16             **THE COURT:**  I'm glad to hear that.

17             **MR. KIYONAGA:**  Thank you, sir.

18             I don't mean to make an excuse, but it created a

19     backlog in all of my cases.  So as of this moment, I expect

20     we should be able to go forward.  But I would hasten to add

21     that I may seek the Court's indulgence in terms of

22     scheduling in the future.

23             **THE COURT:**  Very well.  But for present purposes,

24     I am assuming then that we are trying this case in July.  So

25     here is where I am on the pending motions.  I will start

first with the Motion to Dismiss the case for selective
prosecution which is ECF 57, the thrust of the motion is
that Mr. McKellop and other January 6th defendants, this is
a quote, "can be compared to another group of protesters,
the Portland protesters."  "Despite the government's own
acknowledgment of the severity of the Portland protestors'
actions," McKellop argues, "the government only charged the
Portland protestors with misdemeanors, and in many
instances, subsequently dismissed the charges."  He uses
this alleged disparate treatment to form the basis of his
motion.

As I've written before in other contexts, a
defendant like Mr. McKellop must make two showings, each by
clear evidence, to establish his claim of selective
prosecution; that's well established by cases including
*Attorney General of the United States vs. Irish people,
Inc.*, 684 F.2d 928-932, D.C. Circuit 1982.  Mr. McKellop
must demonstrate both that the prosecution had a
"discriminatory effect" and that it "arose from a
discriminatory intent."  That's *United States vs. Armstrong*
517 U.S. 456 at 465.

McKellop argues that he is similarly situated to
the Portland protestors who were not prosecuted as he notes
"both Mr. McKellop and the Portland defendants were alleged
to have committed violence against federal officers and

1    circumstances where a large crowd was attempting to breach a

2    federal building."

3              As for purpose, he argues, "the discriminatory

4    purpose here is to punish right-leaning protesters.  This

5    purpose is illustrated by the disparate outcomes and large

6    numbers of prosecutions both in Portland in 2020 and

7    Washington in 2021."

8              Now, I disagree on both points.  As I previously

9    noted in other cases raising the same arguments, there are

10   obvious differences between those, like Mr. McKellop who are

11   alleged to have attacked the Capitol on January 6th and

12   those who rioted in the streets of Portland in summer of

13   2020.  The Portland rioters' conduct, while obviously

14   serious, did not target a proceeding prescribed by the

15   constitution, and established to ensure a peaceful

16   transition of power, nor did the Portland rioters, unlike

17   those who assailed America's Capitol in 2021, make it into

18   the buildings they attacked.

19             To be sure, McKellop did not himself enter the

20   building, but as we discussed earlier, he is alleged to have

21   assaulted officers quite violently, including by thrusting a

22   flagpole at one of them and hurling it at others.

23             *Miller* has therefore failed to point to any case

24   that is similar to this one, in which the government made a

25   substantially different prosecutorial decision.  The

1   circumstances between the riots in Portland and the uprising

2   of the nation's Capitol differ in kind and degree.  And the

3   Portland cases and the government's prosecutorial decisions

4   are therefore not sufficiently similar to this case to

5   support this motion.

6          As for improper prosecutorial motive, McKellop

7   must present a credible showing that the government chose to

8   prosecute at least in part of, not merely in spite of, his

9   protected characteristic.  And he points to no evidence of

10  discriminatory intent other than personal conclusions based

11  on anecdotal evidence.  That is not enough to support his

12  motion, even if the Court could look past the threshold

13  failure to demonstrate discriminatory affect.  Accordingly,

14  I will deny McKellop's Motion to Dismiss the case for

15  selective prosecution.

16         Turning to the other pending motion for

17  Mr. McKellop, the motion to change venue, ECF 53, I am not

18  yet ready to issue a ruling.  I will therefore take it under

19  advisement.

20         As to the government's Motions in Limine, I intend

21  to take those three matters under advisement as well.  I

22  will note -- I mean, my plan is to enter an order on them in

23  the relatively near future.

24         I will say, on the self-defense question, I

25  recognize the government was complying with my pretrial

1  schedule.  But it does seems to me that it is premature to

2  resolve that Motion in Limine.  That is very likely where I

3  am going to land.  That's not to say that I may not require

4  a proffer by Mr. McKellop at trial or near trial outside of

5  the presence of the jury.  Only that it seems to me that

6  considering the trial is more than two months from now, that

7  motion is very likely premature.

8           As to improper character evidence, again, I will

9  embody this in an order, but just my thought is, it seems to

10  me that the parties are generally in agreement about what is

11  or is not permissible.  And the only question is whether I

12  should enter an order, essentially stating what the law

13  states or requires.

14           And, obviously in McKellop's view, I don't need to

15  do that because that would just be a mere statement of law.

16  And he wants the latitude to have the possibility of such

17  evidence be at issue, so long as it is properly policed by

18  me.  The government would like to, I guess, exclude it

19  altogether or exclude it altogether to the extent required

20  by law.

21           It's not clear to me that I need to enter such an

22  order now, rather than to just deal with that at trial;

23  that's not because I think that the parties are in serious

24  disagreement about what the law does or does not permit on

25  the question.

1          And on the Secret Service protection, I don't

2    think there is any real disagreement from Mr. McKellop that

3    the government has a very good basis to limit the scope of

4    any questions he might ask.  But his basic argument, as I

5    understand it is, We don't really know what is going to be

6    at issue at trial.  I don't want to be altogether foreclosed

7    from asking questions that you, Judge Nichols, can police.

8          It seems to me that this might be another

9    circumstance where the fact that we are just not at trial

10   yet, I don't have the specific question in mind, I don't

11   have the specific security issue in mind, may lead me to

12   deny the motion.  But not because I think that there should

13   be wide-ranging questions asked about Secret Service

14   protection and protocols, but because there might be, as a

15   result of what happens at trial, some limited questions that

16   make sense.  And I don't want some pretrial order to somehow

17   foreclose that.

18          Having said all of that, those are just my sort of

19   thoughts today.  I intend on those four motions, that is to

20   say the venue motion, the four Motions in Limine, to enter

21   written orders in the relatively near future.  And since we

22   are, at least presently, still getting ready for a trial in

23   a little bit more than two months, I intend to do that

24   quickly.

25          Thank you, Counsel.

1          **MR. KIYONAGA:**  Thank you.

2          **THE COURT:**  Ms. Lesley, I would like to take a

3   recess between this hearing and the next one assuming there

4   is nothing else from the government or you, Mr. Kiyonaga?

5   Anything else, Counsel?

6          **MS. DOHRMANN:**  No, Your Honor.  Thank you.

7          **THE COURT:**  Okay.  Thank you.

8          I'd like to take a break, give the court reporter

9   a chance to rest, and then we will come back for the next

10  hearing.

11          (Proceeding concluded at 1:26 p.m.)

1

## **C E R T I F I C A T E**

2

3              I, **Lorraine T. Herman, Official Court**

4        **Reporter,** certify that the foregoing is a true and

5        correct transcript of the record of proceedings in the

6        above-entitled matter.

7

8

9        ___May 22, 2022___              ___/s/_____
                **DATE**                        **Lorraine T. Herman**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25